## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YANGTZE MEMORY TECHNOLOGIES CO., LTD.,
*No. 88 Weilai 3rd Road, East Lake High-tech*
*Development Zone, Wuhan, Hubei, 430205 China*,

and

YANGTZE MEMORY TECHNOLOGIES, INC.,
*2953 Bunker Hill Lane, Suite 206, Santa Clara,*
*California 95054*,

       Plaintiffs,

   v.

STRAND CONSULT ApS (d/b/a CHINA TECH
THREAT,
*Pilestraede 41-43, Copenhagen, 1112, Denmark*

and

ROSLYN LAYTON,
*Gammel Moent 14, Copenhagen 1117, Denmark*,

      Defendants.

No. 25-cv-3554

## COMPLAINT

Plaintiffs Yangtze Memory Technologies Company, Ltd., and Yangtze Memory Technologies, Inc. (collectively, "YMTC" or "Plaintiffs"), bring this lawsuit against Defendants Strand Consult (d/b/a China Tech Threat) and Roslyn Layton (collectively, "Defendants"). YMTC's Complaint is based on the following allegations, which YMTC makes on personal information as to its own acts and on information and belief as to all others, based on its reasonable investigation.

## NATURE OF THE ACTION

1.      Flash memory chips store large amounts of data in smart phones, TVs, cloud computing centers, and other devices after the device is turned off.  They do not process data; they store it.  Without them, the technology we enjoy could not exist.  In 2023, flash memory sales in the United States exceeded $75 billion.  They are the subject of intense design development and market competition.

2.      YMTC has developed and patented technologies for better flash memories with more capacity and a lower per-bit cost.  YMTC's innovations have gained industry recognition. At the 2018 Flash Memory Summit, YMTC received the award for the Most Innovative Flash Memory Start-up Company.  The Summit recognized YMTC as one of "the most creative and ambitious startup companies" and "applauded" it for "becoming a market disruptor and champion of the storage industry."  YMTC has since continued to innovate.  At the 2022 Flash Memory Summit, YMTC received the award for Most Innovative Memory Technology for its Xtacking® 3.0 3D NAND Architecture.  YMTC's continued innovation was recognized again in 2025 when its Xtacking® 4.0 architecture won the "Most Innovative Technology" award from the Future of Memory and Storage organization at its annual event in California.

3.      YMTC has become a key player in the global 3D NAND market, which has alerted one of YMTC's competitors, Micron Technology Inc. ("Micron").  In November 2023, TechInsights, which analyzes and tracks the flash memory market, described YMTC's accomplishments as "nothing short of amazing"—YMTC "is now the leader in 3D NAND

flash," having "leap-frogged Micron," another major player in the 3D NAND space.[1]  YMTC's ascension threatens Micron's market position.

4.      Rather than compete fairly, Micron resorted to a sham marketing scheme to advertise itself and its products and drive business away from YMTC.  Micron spread lies about YMTC and its products through a coordinated disinformation campaign that was designed to conceal its identity.  As Bloomberg reported in an article titled *Dell, Micron Backed a Group Raising Alarms on Rivals' China Ties*, Micron funded a website called "China Tech Threat" or "CTT," which Defendants Strand Consult ApS and Roslyn Layton run, with content provided by DCI Group AZ, L.L.C. ("DCI").  *See* **Exhibit 1**.[2]  This deception was necessary because the claims would have been discredited as biased, anti-competitive attacks if transparently attributed to Micron.  By laundering the commercial attack through CTT, Defendants sought to deceive the market.  In a related action, DCI admitted to "working with the China Tech Threat," and Micron did not deny its involvement in the scheme despite having the opportunity to do so.

5.      Although CTT claims to discuss policy, its actual business is commercial advocacy for hire.  Neither Defendant Strand Consult nor Defendant Layton has any genuine connection to U.S. political discourse: Strand Consult is a Danish corporation incorporated and headquartered in Denmark, and Defendant Layton resides in Denmark.  Strand Consult's corporate records confirm this.  Its annual reports state that its "purpose is to operate trade and industry, including consultancy."  Its business is focused on public relations, market research, and management consulting, not U.S. public policy.

6.      Essentially, Defendants are spammers engaged in a sham marketing scheme for their own profit.  At the request of Micron, Defendants engaged in a sophisticated "astroturfing" campaign—a deceptive marketing scheme—to damage YMTC's reputation and

---

[1]  *YMTC's Xtacking 3.0, first to 200+ layers*, TechInsights, https://techinsights.com/disruptive-event/ymtc-232l-tlc-3d-nand.

[2]  Brody Ford, *Dell, Micron Backed a Group Raising Alarms on Rivals' China Ties*, Bloomberg Businessweek (Jan. 25, 2024), https://bloomberg.com/news/articles/2024-01-25/dell-micron-backed-a-group-criticizing-chinese-rivals.

business.  This scheme seeks to destroy YMTC's reputation and business by spreading xenophobic lies that YMTC's market-leading flash memory chips are capable of being used to spy on millions of Americans who use the devices in which the chips are embedded, at the behest of the Chinese Communist Party or its People's Liberation Army.

7.     Defendants' statements are false and unlawful.  And Defendants know that.  They know, for example, that their accusations cannot be true because a memory chip is incapable of transmitting its data to another device.  Similarly, their accusations are impossible because memory chips do not execute code.  Defendants know that, too.

8.     Defendants' lies about YMTC and its products were directed to memory-chip customers and thus, have damaged YMTC by disrupting its business relationships and harming its reputation.  That was Defendants' goal.  This sham marketing scheme must be stopped, and Defendants must compensate YMTC for the harm they have caused.

9.     Defendants' involvement in the deceptive scheme was purely transactional, motivated by payment rather than any genuine interest in U.S. policy.  They acted as paid foreign conduits—"hired guns"—for Micron's commercial messaging.  In an interview about Bloomberg's reporting, John Strand, founder and CEO of Strand Consult, admitted that "[o]n the content on China Tech Threat, we have made money," as the non-partisan journalism website NOTUS reported.  **Exhibit 2** at 3.[3]  Strand declined to say whether DCI paid him, Defendant Layton, or Defendant Strand Consult.  *See id.*  On information and belief, Micron and DCI paid individuals and entities associated with China Tech Threat, including Defendants, to disseminate favorable messages about Micron's products and disparaging messages about YMTC's competing products to drive customers away from YMTC and toward Micron.

10.     The Micron-funded and DCI-directed disinformation campaign extended beyond YMTC.  As Bloomberg reported, China Tech Threat also targeted Lenovo, another Chinese

---

[3]  Byron Tau, *Are America's Tech Companies Fanning the Flames of Anti-China Sentiment?*, NOTUS (July 29, 2024), https://www.notus.org/technology/america-tech-companies-anti-china-sentiment.

technology company, at Dell's behest.  It falsely claimed that Lenovo's sponsorship of a video game tournament at a U.S. Navy base constituted "infiltration" of military facilities.  *See* Ex. 1 at 5.  This shows that China Tech Threat is willing to disseminate false and misleading information to advance the interests of its corporate sponsors.

11.    Defendants began their disinformation campaign against YMTC in September 2020, publishing outlandish false statements.  For example, China Tech Threat falsely claimed that YMTC was linked to "criminal activity, including a Social Security spoofing scam, identity theft and cyber extortion."  **Exhibit 3**.[4]  YMTC denies these allegations.  No basis exists for that fiction; China Tech Threat made it up with no citation.  *See id.*  China Tech Threat's website also includes a page titled "China's Army to Infiltrate iPhones with YMTC Chips" dedicated to spreading falsehoods that tarnish YMTC and benefit Micron.

12.    On June 8, 2022, China Tech Threat, at DCI and Micron's direction, published a report titled *Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker YMTC Threatens National Security*.  **Exhibit 4** (CTT Report).  Separate from its petitions to the government for action against YMTC (which are not challenged here), the CTT Report directly targets YMTC's business relationships by imploring "Apple [to] voluntarily end its partnership with YMTC" and "source its chips from existing suppliers like Micron[.]"  *Id.* at 4.  It warns that "the Apple-YMTC deal will likely hasten the exit of an existing memory chip maker from a democratic country" and "could put at least one major non-Chinese semiconductor producer out of business"—highlighting that "[t]he only American company" leading the memory market is "the Idaho-based Micron, which makes both DRAM and NAND chips."  *Id.* at 5-6, 8.  This is corporate procurement language, not legislative language.

13.    The CTT Report also uniquely airs Micron's grievances against its competitors.  For example, it accuses a Chinese chipmaker of "hir[ing] away Micron engineers and

---

[4]    *As YMTC Booms, China Aims to Dominate Flash Memory Industry*, China Tech Threat (Jan. 4, 2021), https://chinatechthreat.com/as-ymtc-booms-china-aims-to-dominate-flash-memory-industry

encourag[ing] them to steal Micron trade secrets." Ex. 4 at 7.  The allegation of encouraging theft is false.  The Report does not discuss alleged theft of any other chipmaker's intellectual property.  This shows the CTT Report's true purpose is to advance Micron's agenda.

14.    The CTT Report's central claim—that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing" and "exfiltrate data," compromising "iPhone users' security and privacy"—is false.  Ex. 4 at 4, 10-11.  YMTC's memory devices store "bits," zeroes and ones.  Memory devices—YMTC's or others—cannot execute code to "funnel" or "exfiltrate" data to Beijing or anywhere else.  Memory chips lack the most basic components necessary for remote control and wireless communications—e.g., antennas, modems, RF processors, and more.  And YMTC has no ability to make a chip that could secretly use parts of a mobile device without the device manufacturer knowing.

15.    Defendants know this.  Defendants Strand and Layton claim to have decades of experience in the technology and telecommunications sectors.  Given their claimed expertise, they knew or should have known that memory chips are incapable of executing spyware or being remotely disabled, and that their statements about YMTC's products are false.  Their decision to publish these technically impossible claims shows a willful blindness to the truth and makes their dissemination of this false information particularly egregious.

16.    China Tech Threat's reports and statements directly benefited Micron, both commercially and reputationally.  Micron faced pricing pressure and the need to improve manufacturing efficiency due to YMTC's emergence as a competitor.  With a limited number of major chip manufacturers, a failed deal for YMTC materially increased Micron's likelihood of securing those deals, a dynamic that played out in the market.

17.    Micron's aim was to eliminate YMTC as a competitor by way of CTT's astroturfing campaign.  CTT's false and misleading statements were part of an ongoing scheme that Defendants, DCI, and Micron orchestrated to damage YMTC and protect Micron's market share.  As Bloomberg reports, "[w]hile CTT presents as a standalone organization, it is actually a project of DCI Group, a public affairs and consulting firm with a history of 'astroturfing,' the

technique of disguising corporate messaging as grassroots advocacy." Ex. 1 at 2-3. On information and belief, Micron is a client of DCI—a relationship that Micron did not dispute despite the opportunity to do so.

18.     Defendants' falsehoods through China Tech Threat have harmed YMTC's reputation and business relationships. They have also hurt U.S. consumers. 3D NAND flash memory is vital technology for many of the digital products that consumers have come to depend on and enjoy, such as smartphones, laptops, and tablet computers, as well as for the data centers and enterprise storage solutions in which 3D NAND is used. Competition and innovation in the NAND memory space benefit consumers, as competition and innovation lead to better products at better prices. Stifling competition and hindering innovation does neither.

19.     YMTC respectfully asks this Court to stop Defendants' illegal campaign and conspiracy of spreading misinformation about YMTC and YMTC's products through China Tech Threat and elsewhere and compensate YMTC for the harm caused by Defendants' lies.

## THE PARTIES

20.     Plaintiff Yangtze Memory Technologies Company, Ltd. ("YMTC Ltd.") is a leading developer and manufacturer of advanced 3D NAND flash memory and related storage technologies. YMTC Ltd. is headquartered in Wuhan, China, and competes in the global semiconductor industry, including throughout the United States. YMTC Ltd. pioneered and commercialized Xtacking® architecture, a technology that advanced memory chip performance and efficiency and positioned YMTC Ltd. as a competitive threat to incumbents like Micron .

21.     Plaintiff Yangtze Memory Technologies, Inc. ("YMT Inc.") is a wholly owned subsidiary of YMTC Ltd., incorporated under California law with its principal place of business at 2953 Bunker Hill Lane, Suite 206, Santa Clara, California 95054. YMT Inc. manages YMTC's U.S. market entry, business development, and customer engagement activities. YMT Inc. competed with Micron for major U.S. opportunities before Defendants' coordinated false advertising campaign impaired YMTC's commercial standing.

22.     Defendant Strand Consult ApS has its principal place of business in Copenhagen, Denmark, and does business as China Tech Threat.  Strand Consult runs the website "chinatechthreat.com" and engages in public relations focused on the telecommunications industry.  Strand Consult disseminates information targeting technology markets in the United States, including the District of Columbia.

23.     Defendant Roslyn Layton is Executive Vice President of Strand Consult and a co-founder of China Tech Threat.  Layton lives in Copenhagen, Denmark.  Layton also lists a Naples, Florida address on China Tech Threat correspondence.  Layton is registered to vote in Florida.  On information and belief, Layton regularly engages in business activities and communications related to China Tech Threat within the United States.

### JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which creates a federal cause of action for injuries resulting from false or misleading representations in commercial advertising or promotion.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

25.     This Court has personal jurisdiction over both Defendants because they consented by contract to jurisdiction in this District through the Terms of Use governing the China Tech Threat website.  *See* **Exhibit 5** (CTT Terms of Use).[5]  The Terms of Use, which are a "binding agreement," state that the CTT website is "owned and operated by St[r]and Consult."  *See id.* at 3.  As the owner and operator of the China Tech Threat website, Defendant Strand Consult is bound by the terms it imposes on all users.  Section 13 of the Terms of Use provides that the relationship "will be governed by the laws of the United States and the District of Columbia" and that any legal action arising from the website "must be instituted exclusively in the federal or state courts located in the District of Columbia and in no other jurisdiction."  *Id.* at 6.  The terms

---

[5]     *See* Terms of Use, China Tech Threat, https://chinatechthreat.com/terms-conditions/.

also "consent to exclusive personal jurisdiction and venue in, and agree to service of process issued or authorized by, any such court." *Id.*

26.     Defendant Roslyn Layton is also bound by the China Tech Threat Terms of Use and has consented to jurisdiction in this District.  As Executive Vice President of Strand Consult and co-founder of China Tech Threat, Layton was a principal agent acting for Strand Consult, doing business as China Tech Threat.  She disseminated the content through the China Tech Threat website, thereby using the website and its services.  The Terms of Use apply to any party who accesses or uses the website.  By authoring and publishing the CTT Report on the website she co-founded and helps operate, Layton availed herself of the forum selected in the website's governing terms.

27.     Additionally, as an independent basis for jurisdiction, Defendants are subject to personal jurisdiction in this District under the District of Columbia's long-arm statute. Defendants purposefully direct their campaign at this District, targeting media organizations, commercial decision-makers, and relevant stakeholders.  Defendant Strand Consult, through its operation of China Tech Threat, and Defendant Layton, through her leadership roles and authorship of the China Tech Threat Report, caused tortious injury in this District by acts committed both within and outside the District while regularly soliciting business and engaging in a persistent course of conduct here.  These forum-related activities are directly and causally linked to Plaintiffs' injuries and satisfy D.C. Code § 13-423(a)(1) (transacting business) and (a)(4) (causing tortious injury in D.C. by an act outside D.C. while engaging in persistent conduct in D.C.).

28.     Venue is proper in this District based on the mandatory forum selection clause in Section 13 of the China Tech Threat Terms of Use, which requires that any legal proceeding "must be instituted exclusively in the federal or state courts located in the District of Columbia." *See* Exhibit 5 at 6.  Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred here. Defendants directed their false advertising at and through District-based entities, and the

resulting harm to YMTC's reputation and business was concentrated in this forum.  No other district has a greater connection to the operative facts underlying this action.

## RELATED CASES

29.     In June 2024, Plaintiffs sued Defendants in the Northern District of California. *See Yangtze Memory Techs., Inc. et al. v. Strand Consult et al.*, No. 5:24-cv-03454-NW (N.D. Cal.).  Although the court found it had personal jurisdiction over Defendants, the court ultimately dismissed the case against Defendants on *forum non conveniens* grounds on October 2, 2025.  In doing so, the court did not have before it the China Tech Threat's website's mandatory forum selection clause requiring that any lawsuit arising from its content be filed in the District of Columbia.

30.     A related action is pending in this District against Micron Technology, Inc. and DCI Group AZ, L.L.C., alleged co-conspirators in the same false advertising scheme.  *See Yangtze Memory Techs., Inc. et al. v. Micron Tech., Inc. et al.*, No. 25-cv-01795-CJN (D.D.C.).

## ALLEGATIONS COMMON TO ALL CLAIMS

### *YMTC Is Recognized As One Of The Most Innovative 3D NAND Memory Companies*

31.     YMTC is a fully integrated device manufacturer that designs, develops, and produces advanced memory products for global markets.  YMTC employs more than 7,400 professionals worldwide, including over 5,600 engineers, 1,700 research and development specialists, and 300 PhD-level experts, reflecting YMTC's commitment to technical innovation and excellence.

32.     YMTC's investment in 3D NAND flash memory technology has resulted in a series of major innovations, earning widespread recognition in the semiconductor industry. YMTC has designed and manufactured 3D NAND flash memory chips that set new benchmarks for bit density, input/output performance, and storage capacity.

33.     YMTC's repeated honors from the Flash Memory Summit, the world's leading conference for flash memory and storage technologies, underscore YMTC's leadership.  The Summit recognized YMTC in 2018 with the "Best of Show" award for "Most Innovative Flash

startup companies" and highlighting its potential to become "a market disruptor and champion of the storage industry." In 2022, the Summit awarded YMTC's Xtacking® 3.0 3D NAND Architecture the "Most Innovative Memory Technology" award, cementing its reputation for industry-leading innovation. YMTC's continued innovation was recognized again in 2025 when its Xtacking® 4.0 architecture won the "Most Innovative Technology" award from the Future of Memory and Storage organization at its annual event in California.

34.    Independent industry analysis confirms YMTC's technological leadership. TechInsights, a leading authority in semiconductor analysis, identified YMTC's 3D NAND chip as "the world's most advanced 3D NAND memory chip in a consumer device," with "the highest bit density seen in a commercially available NAND product."[6]

35.    As a result of its technological advancements, a leading consumer products designer and manufacturer ("YMTC OEM Customer #1"), headquartered in the United States, selected YMTC to supply its advanced memory chips in 2022. Defendants were aware of this business relationship, including the customer's United States headquarters, the presence of YMTC's sales personnel in the United States, and the negotiation and performance of the agreement within the United States.

36.    During this period, YMTC also had active commercial and technical discussions with other prospective customers and partners in the United States ("Prospective YMTC OEMs"). These business activities underscore YMTC's substantial and continuous presence in the United States market—commercial opportunities that Defendants targeted to disrupt.

*At the Behest of a Competitor, Defendants Launch a False Advertising Campaign*

37.    Micron Technology, Inc. manufactures and supplies memory products for consumer and enterprise products, systems, and services, including 3D NAND. Although Micron started developing 3D NAND before YMTC was founded in 2016, by 2022, industry publications recognized that YMTC was by then "the leader in 3D NAND flash," having "leap-

---

[6]  *See China Does It Again: A NAND Memory Market First*, TechInsights, https://www.techinsights.com/blog/china-does-it-again-nand-memory-market-first.

frogged Micron."[7]  Industry insiders predicted that "YMTC would be the uncontested Flash technology leader before 2030," concluding that "[w]hat YMTC has accomplished has been nothing short of amazing."  *See id.*

38.    Micron, facing a direct challenge to its market share and profitability from YMTC's ascent, was economically motivated to resort to a disinformation campaign.  Rather than innovating and competing on the merits of its products, Micron sought to undermine YMTC's competitive standing through false and misleading advertising, product disparagement, and deceptive promotional activities directed toward customers of memory device products.

39.    As Bloomberg reported, Micron funded China Tech Threat—jointly run by its agents, Defendants and DCI—to engage in advocacy "align[ed] with [its] corporate interests." *See* Ex. 1 at 2.  Although China Tech Threat presented itself as an independent research and advocacy organization focused on policy, Bloomberg's investigation established that CTT was, in fact, an "astroturfing" operation to disguise Micron's commercial messaging and attacks on competitors as grassroots advocacy and policy analysis.  *See* Ex. 1 at 2.

40.    Micron is a member of the Semiconductor Industry Association (SIA), a trade association that advocates for policy changes affecting the semiconductor industry.  SIA's advocacy materials request government action on issues like export controls, trade policy, and research funding—without directing electronics manufacturers to favor any specific chip supplier.  If Micron had wanted to influence government policy regarding YMTC, it would have pursued such advocacy through legitimate channels like SIA or by engaging directly with policymakers in its own name.  Instead, Micron chose to operate through surrogates rather than established industry channels, underscoring the commercial nature of Defendants' conduct.

41.    Micron, with DCI and Defendants, used the China Tech Threat website to disseminate false and misleading claims about YMTC and its products to the relevant purchasing public and media.  To mask the campaign's commercial purpose, CTT also engaged in separate

---

[7]  *YMTC's Xtacking 3.0, First to 200+ Layers*, TechInsights, https://www.techinsights.com/disruptive-event/ymtc-232l-tlc-3d-nand.

political advocacy. CTT's political statements are not at issue here. Rather, this action solely concerns CTT's commercial statements, which disparaged YMTC to directly benefit Micron, promoted Micron as a preferable U.S.-based memory manufacturer, and urged YMTC's customers and potential customers, including those in the United States, to abandon YMTC in favor of Micron's products.

### *The Structure and Mechanics of Defendants' Deceptive Scheme*

42.    Defendants' deceptive scheme centered on concealing the commercial interests behind their attacks on YMTC. They carried out the campaign by disseminating false and misleading information through the China Tech Threat website and related materials, while hiding that it was funded by YMTC's competitor, Micron, and executed by DCI at Micron's direction. From 2020 to 2022, DCI secretly created content for Defendants to publish under the guise of independent authorship. For example, a press release falsely alleging YMTC's ties to the Chinese military listed Defendant Layton as the author, even though it was in fact written by DCI employees. *See* **Exhibit 6** at 2.

43.    The non-partisan journalism website NOTUS corroborated these findings, reporting that "DCI Group employees were included in the metadata of the documents embedded on the [China Tech Threat] website over the past several years." Ex. 2 at 3. NOTUS also noted that some documents listing DCI employees as the author "have since been taken down [from the China Tech Threat website] and replaced with new documents without metadata, but the older versions have been captured by the Internet Archive's Wayback Machine." *Id.*

44.    Promotional materials that DCI authored mirror the false and misleading statements in the CTT Report. For example, the report titled *Secure Equipment: The Whole of Government Effort to Restrict Dangerous Devices* states, without citation, that "YMTC chips can be enabled with kill switches which can cause a device and/or network shutdown." *See* **Exhibit 7** at 5. It also claims that vulnerabilities in these chips "could be exploited months or years later to disrupt or exfiltrate data from a system containing the compromised chip." *See id.*

These unsubstantiated assertions mirror the CTT Report's false allegations of spyware and data exfiltration to Beijing.  *See* Ex. 4 at 11.  The CTT Report reprints the latter statement ***verbatim***.

45.    The *Secure Equipment* report attributes authorship to China Tech Threat and does not indicate DCI's involvement.  Only through analysis of the report's metadata did YMTC learn that DCI employee Emily Sullivan was its true author, as shown in the screenshot below:



46.    By concealing the commercial nature of the China Tech Threat campaign, Defendants prevented YMTC from discovering the true source of the false advertising. Defendants presented China Tech Threat to the public as an independent and objective policy research organization and omitted any disclosure of Micron's funding or DCI's role in authoring the content.  This concealment created the false impression that CTT's publications were independent analysis, rather than paid-for commercial attacks orchestrated by YMTC's competitor.  This sophisticated "astroturfing" scheme deceived the public about the content's origin and commercial motivation.

47.     Despite exercising reasonable diligence, YMTC was unable to discover this facade.  It was only uncovered through the work of investigative journalists, whose reporting exposed the scheme's mechanics.  In January 2024, a Bloomberg report first revealed that CTT was not a standalone organization but an "astroturfing" front for corporate interests.  Later, a July 2024 investigation by the non-partisan website NOTUS confirmed that metadata from documents on the CTT website, which Defendants published, listed DCI employees as authors.  These revelations, which required the unique capabilities of news organizations, provided YMTC with its first notice of the scheme.

48.     After these public reports exposed the scheme, Defendants took part in destroying evidence of the concealment.  Upon information and belief, they removed the incriminating metadata from documents on the CTT website and replaced the original files with scrubbed versions.  This conduct further shows Defendants' intent to conceal the true authorship and commercial purpose of their false statements.

49.     Defendants' scheme to create a "front" website surreptitiously backed by a YMTC competitor is an established DCI tactic.  The firm ran a seemingly independent website called Tech Central Station that voiced ostensible policy opinions.  In reality, DCI operated the website as a front to promote its corporate clients' goods, services, and commercial activities.[8] In an earlier report, *Bloomberg Businessweek* reported that a DCI unit maintains ties "with dozens of nonprofits and advocacy groups, regularly contributing money and then requesting their assistance on projects."[9]  One former DCI employee has stated that "staffers, policy experts, and even journalists were fed lines" by DCI.  *Id.*

---

[8]   *See* Nick Confessore, *How James Glassman reinvented journalism—as lobbying*, Wash. Monthly (Dec. 2, 2003), https://washingtonmonthly.com/2003/12/02/meet-the-press.

[9]   Zachary Mider & Ben Elgin, *How Hedge Funds (Secretly) Get Their Way in Washington*, Bloomberg Businessweek (Jan. 25, 2018), https://www.bloomberg.com/news/features/2018-01-25/how-hedge-funds-secretly-get-their-way-in-washington.

***Defendants Spread Lies About YMTC And Its Products, Inuring To Micron's Benefit***

50.    Micron, along with DCI and Defendants, engaged in a dual-track campaign. While one track feinted as advocacy directed at government officials (which is not challenged in this action), the second track—the subject of this Complaint—involved a deceptive commercial marketing scheme that Defendants executed to target private commercial actors and disrupt YMTC's business relationships.  Through the China Tech Threat website, Defendants published falsehoods to portray YMTC as a national security threat to dissuade current and future customers from working with YMTC.  The campaign falsely linked YMTC's memory products to military espionage, criminal conduct, and impossible malicious capabilities.

51.    For example, Defendants' publications asserted that "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion," despite offering no evidence or reference to any legitimate investigative finding.  Similarly, on the CTT website, Defendants maintained a section titled "China's Army to Infiltrate iPhones with YMTC Chips,"[10] relying on inflammatory language and visuals to falsely suggest that the mere use of YMTC chips in consumer devices is a direct espionage threat:



---

[10]    *See China's Army to Infiltrate iPhones with YMTC Chips*, China Tech Threat, https://chinatechthreat.com/chinas-army-to-infiltrate-iphones-with-ymtc-chips.

52.     A key part of the campaign was the June 8, 2022, CTT Report, *Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker YMTC Threatens National Security* (the "CTT Report").  Ex. 4.  The CTT Report contains false and misleading statements that are framed as declarative facts.  For example, it falsely says that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing."  Ex. 4 at 11.  It also falsely says that "built-in and concealed vulnerabilities" in YMTC chips could be "exploited months or years later to disrupt performance or exfiltrate data from a system containing the compromised chip."  *Id.* at 10.  Under the heading "Risk #1: National Security – The Battlefield Control Switch," the CTT Report misleadingly claims that YMTC chips could have a "kill switch" that "could be enabled or programmed to shut down remotely by an unauthorized Chinese government actor."  *Id.*  And the CTT Report even deceptively claims that these purported vulnerabilities "would not be detected during manufacturing."  *Id.*  Remarkably, the only "support" that the CTT Report cites for this lie is a ***work of fiction*** titled "Ghost Fleet: A Novel of the Next World War."  *Id.*  Defendants each took part in publishing the CTT Report, directly controlling and monitoring the content, and knowingly allowing its publication.

53.     The CTT Report's statements are false and misleading.  YMTC designs and manufactures memory chips that store data.  Memory chips, including YMTC's, lack the components for wireless transmission or remote control (antennas, modems, RF processors).  YMTC's NAND chips cannot execute code; they simply store data.  But the ordinary reader in the relevant audience, as well as YMTC's customers and potential customers, would understand these statements to mean that YMTC's memory chips are subject to remote control from China, capable of spying on American consumers, and designed to send user information to China.  *See* Ex. 4 at 9, 10.  These statements disparage YMTC and its products to the memory device market, creating a false impression of national security risks and Chinese surveillance of the American public.  *Id.* at 4.

### Defendants Knew Their Statements Were False and Misleading

54.     Defendants knew, or acted with reckless disregard for the truth, that their statements about YMTC's products having spyware, kill switches, or other malicious data exfiltration capabilities were false and technically infeasible.  Defendant Strand Consult presents itself as a leading telecommunications technology authority with 25 years of experience. Defendant Layton claims expertise in "telecom network innovation" and "network security."

55.     Given their claimed technical expertise, and the expertise and sophistication of Micron and DCI, Defendants' dissemination of this false information was egregious.  They were not merely mistaken; they were either knowingly propagating lies or acting with a reckless indifference to the truth for commercial gain.  The statements in the CTT Report and other CTT publications, given their technical absurdity, show at least a reckless disregard for the truth.

### The Commercial Nature and Intent of Defendants' Statements

56.     The CTT Report and other publications and statements were not good-faith contributions to public policy.  Some of these statements feinted as government petitions, which are not challenged here, but do not and cannot change that CTT's reports contained commercial false advertising.  The commercial statements themselves were covert commercial advertisements designed to promote Micron at YMTC's expense and call for YMTC's current and prospective customers to stop transacting with YMTC.

57.     This was no accident.  As YMTC's competitor, Micron was the direct beneficiary of these unlawful tactics.  In August 2022, Micron's CFO, Mark Murphy, acknowledged that YMTC had "made progress" and "got some engagements with customers now," stating this was a "concern for the NAND space."[11]  The CTT campaign—funded, directed, and orchestrated by Micron—sought to eliminate this competitive "concern" through falsehoods designed to divert business to Micron.

---

[11]   Alan Patterson, *Micron's Mixed CapEx Plans Square Up, Analyst Says*, EE Times, https://www.eetimes.com/microns-mixed-capex-plans-square-up-analyst-says/.

58.    The CTT Report repeatedly promoted Micron as a preferred, American alternative to YMTC.  For example, the report highlights "Idaho-based Micron" as the "only American company" in its field and urges Apple to "source its chips from existing suppliers like Micron" or "source memory chips from non-Chinese chipmakers like Micron."  Ex. 4 at 4, 8, 14.  These were commercial solicitations aimed at influencing purchasing decisions away from YMTC and towards Micron.

59.    Micron's objective was to eliminate or cripple YMTC as a competitor in the concentrated 3D NAND flash memory market to protect its own market share and profitability.  In this small market with only a handful of memory device suppliers, Defendants' articles disrupted YMTC's commercial relationships and dissuaded existing and potential customers from transacting with YMTC.  This was not an effort to shape public policy; it was a targeted attack on a business rival.  The CTT Report's overt commercial solicitation and its address to specific companies underscore the anti-competitive intent and market-distorting purpose of Defendants' conduct.

### *Defendants' Unlawful Conduct Has Significantly Harmed YMTC*

60.    Defendants conducted a campaign of false advertising designed to injure YMTC's business and to confer unlawful competitive advantages on Micron.  Pretending to be independent actors engaged in advocacy, Defendants published false and misleading statements about YMTC and its products—distinct from any legitimate petitioning—targeting YMTC's U.S. customers and commercial partners, to promote Micron's interests.

61.    Defendants' false and misleading statements caused YMTC to lose significant business opportunities and derailed ongoing negotiations with major customers and technical partners in the United States.  These disruptions resulted in the loss of millions of dollars in sales to leading computer and consumer electronics manufacturers in the United States and abroad.  The campaign damaged YMTC's business relationships and impaired its market standing in the United States.  Defendants' conduct harmed the reputation and goodwill of YMTC and its U.S. subsidiary, causing deterioration in relationships with key customers and partners.  Ex. 4 at 4, 14.

62.     For example, YMTC lost business with a leading original equipment manufacturer ("OEM Customer #1").  YMTC had completed this OEM's qualification processes and was positioned to supply advanced 3D NAND flash memory chips for flagship products. Industry data confirmed YMTC's pricing was approximately 20% below competitors, and OEM Customer #1 was considering sourcing up to 40% of its global NAND requirements from YMTC.  After Defendants intensified their disinformation campaign in mid-2022—specifically targeting this relationship with fabricated security allegations—OEM Customer #1 suspended and later abandoned plans to use YMTC chips as of October 2022.  This single lost opportunity alone accounted for hundreds of millions of dollars in lost revenue.

63.     As a direct and foreseeable result, YMTC has suffered substantial financial harm, including lost sales, lost market opportunities, and increased mitigation costs.  The harm also reportedly compelled YMTC to implement a 10% reduction in workforce in early 2023.  Beyond immediate financial injury, Defendants' conduct has inflicted lasting damage on YMTC's reputation and commercial standing across the technology sector.  The campaign's false narrative portraying YMTC as an untrustworthy and criminally-linked enterprise generated suspicion among market participants, impairing YMTC's ability to compete on the merits.

## FIRST CLAIM FOR RELIEF

**(False Advertising, Product Disparagement, and Unfair Competition in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a))**

**(Directly Against Defendants Strand and Layton)**

64.     YMTC repeats and realleges paragraphs 1 through 63 above as if set forth herein.

65.     Defendants conducted a commercial campaign of false advertising and product disparagement targeting YMTC and its 3D NAND flash memory products.  They disseminated false and misleading statements in interstate commerce through the CTT website, articles, press releases, social media, industry presentations, and direct communications with YMTC's current and prospective customers.

66.     Defendants' "astroturfing" campaign sought to undermine YMTC's competitive standing and divert sales to Micron, YMTC's direct competitor in the 3D NAND flash memory market.  Defendants' unlawful conduct was: (a) commercial in nature, promoting Micron's competing 3D NAND flash memory products while disparaging YMTC's; (b) designed to influence purchasing decisions of OEMs, businesses incorporating memory chips, and ultimate consumers by diverting sales from YMTC to Micron; and (c) disseminated broadly to the relevant purchasing public through the channels above, ensuring wide exposure to the false and misleading claims.

67.     CTT's direct appeals to companies like Apple to abandon YMTC and purchase from Micron constitute actionable commercial speech.  Any purported advocacy was distinct from the commercial statements at issue.  This lawsuit does not challenge genuine advocacy; it targets Defendants' false and misleading commercial statements that deliberately targeted Plaintiffs current and prospective customers.

68.     As part of Defendants' campaign, they made false and misleading statements of fact in their commercial advertising and promotion.  These statements exploited xenophobic anxieties and prejudice against YMTC to benefit Micron, a U.S.-based company.  These statements, some of which were literally false and others misleading though literally true, included, among others:

(a)     The false and/or misleading statement: "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion," published by Defendants on January 4, 2021, on the China Tech Threat website.  Ex. 3.

(b)     The false and/or misleading statement: "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(c)     The false and/or misleading statement: "YMTC chips… present the possibility that malicious technology… from the Chinese military could be introduced to Apple end-users," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(d)    The false and/or misleading statement: "YMTC chips could be…
intentionally compromised with rogue features… These built-in and concealed
vulnerabilities would not be detected during manufacturing.  They could be exploited …
to disrupt performance or exfiltrate data," published by Defendants on June 8, 2022, in
the CTT Report.  Ex. 4.

(e)    The false and/or misleading statement: "Electronics with embedded chips
are enabled with a 'kill switch'… Such features, under Chinese military production,
could be enabled… to shut down remotely by an unauthorized Chinese government
actor," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.  Defendants'
statement misleadingly suggested that YMTC's memory chips could execute code and
activate a "kill switch" in devices.  This is false because YMTC's memory chips, unlike
microprocessors, do not execute code.  Defendants further fueled this misconception by
citing an article about cyberattacks on military hardware involving microprocessors,
using the term "chip" to imply that YMTC's products could similarly be compromised.

69.    These and other false and misleading statements, disseminated through the
channels described above, falsely portrayed YMTC and its products as: (a) posing national
security risks; (b) containing spyware and "kill switches"; (c) being vulnerable to manipulation
by the Chinese government; and (d) being associated with criminal activity.  These
representations were either literally false or, though literally true, misleading due to omissions
and implications.

70.    Defendants knew, or recklessly disregarded, the falsity or misleading nature of
these statements.  They compounded the deception by concealing Micron's funding and DCI's
direction of the disinformation campaign, creating a false impression of objectivity and
independent analysis, when in reality, the China Tech Threat publications and statements were
paid-for commercial advertising and promotion for Micron.

71.    Defendants' statements deceived, or had the tendency to deceive, a substantial
segment of the relevant purchasing public, or those making purchasing decisions, including

YMTC's customers and prospective customers, OEMs, businesses, and consumer end-users, who rely on or likely will rely on accurate information about technology products when making purchasing decisions.  Defendants knew, or reasonably should have known, that their statements were false or misleading and intended to deceive these audiences into believing that YMTC and its products posed a security risk, were inferior in quality to Micron's products, or were otherwise undesirable.

72.     Defendants' deceptive statements were material and likely to influence purchasing decisions.  Consumers and businesses, particularly in the technology sector, are sensitive to national security concerns and the potential for data breaches and cyberattacks.  The false and misleading claims of spyware, Chinese government control, and criminal activity that Defendants published exploited these sensitivities and deceived the relevant purchasing public. This deception directly influences, or is likely to influence, the purchasing decisions of these audiences, causing them to refrain from purchasing products with YMTC chips and from doing business with YMTC, thereby directly and foreseeably harming YMTC's sales, revenue, and market share.

73.     As a direct and proximate result of Defendants' false and misleading advertising and promotion, YMTC suffered substantial injury, including harm to YMTC's reputation and goodwill, resulting in lost sales, revenue, opportunities, and market share, as well as expenses incurred to mitigate the harm caused by Defendants' false statements.  Defendants' false statements also directly harmed YMTC's reputation and goodwill within the industry and among consumers, making it more difficult for YMTC to compete effectively in the market, attract and keep customers, secure investments, and recruit and retain employees.  Defendants' conduct was a substantial factor in causing these harms to YMTC.  Micron, as YMTC's direct competitor in the relevant market, directly and proximately benefited from this harm by capturing market share, sales, and/or revenue that otherwise would have gone to YMTC.

74.     Defendants' conduct constitutes false advertising and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

75.     YMTC is entitled to recover from Defendants all damages directly and proximately caused by Defendants' unlawful conduct in an amount to be determined at trial, including for actual damages, lost profits, damages to reputation and goodwill, corrective advertising costs, and disgorgement of Defendants' profits attributable to false advertising. YMTC also seeks prejudgment interest, costs, and attorneys' fees in accordance with governing law, especially given the exceptional nature of Defendants' unlawful conduct.

76.     YMTC also has no adequate remedy at law and therefore seeks injunctive relief to prevent Defendants from repeating or republishing these false and misleading statements, as well as corrective advertising to mitigate the harm caused by Defendants' unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, YMTC respectfully requests that the Court render the following relief:

1.     Grant judgment in favor of YMTC and against each Defendant;

2.     Grant all appropriate injunctive relief, including corrective advertising;

3.     Award YMTC an appropriate amount in monetary damages against Defendants as determined at trial, including general, compensatory, special, and treble damages, and including pre-judgment interest, in accordance with applicable law;

4.     Award YMTC disgorgement of Defendants' profits; and

5.     Grant YMTC such other relief as is just and appropriate, including attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

YMTC hereby demands a trial by jury.


Dated: October 3, 2025

QUINN EMANUEL URQUHART
& SULLIVAN LLP

By _____

David Needham (D.C. Bar. 1017372)
  davidneedham@quinnemanuel.com
1300 I Street NW
Washington, DC 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Evan Pearson (*pro hac vice to be filed*)
  evanpearson@quinnemanuel.com
300 West Sixth Street, Suite 2010
Austin, Texas 78701-3901
Telephone: (737) 667-6100
Facsimile: (737) 667-6200

Robert M. Schwartz (D.C. Bar 412049)
  robertschwartz@quinnemanuel.com
Aaron Perahia (*pro hac vice to be filed*)
  aaronperahia@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

David E. Eiseman (D.C. Bar 1015590)
  davideiseman@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Plaintiffs Yangtze Memory Technologies, Inc.*
*and Yangtze Memory Technologies Company, Ltd*