# Exhibit H

**In case of any discrepancy between the original Danish text and the English translation of this Act, the Danish text shall prevail.**

# Marketing Practices Act[1]

Part 1
*Introductory provisions*

*Scope of this Act*

**1.-(1)** This Act applies to private business activity and to public activity to the extent that products are offered in the market.
*(2)* Sections 3, 4, 9 and 14 do not apply to businesses subject to the Financial Business Act to the extent that the Minister for Business and Growth has issued regulations for the areas concerned.
*(3)* Sections 15 and 16 do not apply to businesses subject to the Financial Business Act.

*Definitions*

**2.-(1)** For the purposes of this Act:
1) 'consumer' means any natural or legal person who is primarily acting for purposes which are outside his trade, business, craft or profession;
2) 'trader' means any natural or legal person who is acting for purposes relating to his trade, business, craft or profession and anyone acting in the name of or on behalf of a trader;
3) 'product' means any goods or service, including immovable property, rights and obligations;
4) 'commercial practices' means any act, omission, course of conduct, representation or commercial communication, including advertising and marketing, by a trader, directly connected with the promotion, sale or supply of a product to consumers;
5) 'transactional decision' means any decision taken by a consumer concerning whether, how and on what terms to purchase, make payment in whole or in part for, retain or dispose of a product or to exercise a contractual right in relation to the product, whether the consumer decides to act or refrain from acting;
6) 'to materially distort the economic behaviour of consumers' means using a commercial practice to appreciably impair the consumer's ability to make an informed decision, thereby causing the consumer to take a transactional decision that he would not have taken otherwise;
7) 'code of conduct' means an agreement or set of rules not imposed by law, regulation or administrative provision which defines the behaviour of traders who undertake to be bound by the code in relation to one or more particular commercial practices or business sectors;
8) Code owner: 'code owner' means any entity, including a trader or group of traders, which is responsible for the formulation and revision of a code of conduct or for monitoring compliance with the code by those who have undertaken to be bound by it;
9) 'good commercial practice' means the standard of special skill and care which a trader may reasonably be expected to exercise towards consumers, commensurate with honest market practice or the general principle of good faith in the trader's field of activity. This concept covers the same as the concept of 'professional diligence' applied in directive 2005/29/EC concerning unfair commercial practices.
10) 'invitation to purchase' means a commercial communication which indicates characteristics of the product and the price in a way appropriate to the means of the commercial communication used and thereby enables the consumer to make a purchase;
11) 'undue influence' means exploiting a position of power in relation to the consumer so as to apply pressure, even without using or threatening to use physical force, in a way which significantly limits the consumer's ability to make an informed decision;
12) 'regulated profession' means a professional activity or a group of professional activities, access to which or the pursuit of which, or one of the modes of pursuing which, is conditional, directly or indirectly, upon possession of specific professional qualifications, pursuant to laws, regulations or administrative provisions;

---

[1] This Act contains provisions implementing Directive 1998/6/EC of the European Parliament and of the Council of 16 February 1998 on consumer protection in the indication of the prices on products offered to consumers, Official Journal of the European Communities 1998, L 80/27; Directive 1999/44/EC of the European Parliament and of the Council of 25 May 1999 on certain aspects of the sale of consumer goods and associated guarantees, Official Journal of the European Communities1999, L 171/12; Directive 2002/58/EC of the European Parliament and of the Council of 12 July 2002 concerning the processing of personal data and the protection of privacy in the electronic communications sector, Official Journal of the European Communities 2002, L 201/37; Directive 2005/29/EC of the European Parliament and of the Council of 11 May 2005 concerning unfair business-to-consumer commercial practices in the internal market and amending Council Directive 84/450/EEC, Directives 97/7/EC, 98/27/EC and 2002/65/EC of the European Parliament and of the Council and Regulation (EC) No 2006/2004 of the European Parliament and of the Council, Official Journal of the European Union 2005, L 149/22; parts of Directive 2006/114/EC of the European Parliament and of the Council of 12 December 2006 concerning misleading and comparative advertising, Official Journal of the European Union 2006, L 376/21; Directive 2006/123/EC of the European Parliament and of the Council of 12 December 2006 on services in the internal market, Official Journal of the European Union 2006, L 376 of 27 December 2006, page 36; Directive 2008/48/EC of the European Parliament and of the Council of 23 April 2008 on credit agreements for consumers and repealing Council Directive 87/102/EEC, Official Journal of the European Union 2008, L 133/66; Directive 2009/136/EC of the European Parliament and of the Council of 25 November 2009 amending Directive 2002/22/EC on universal service and users' rights relating to electronic communications networks and services, Directive 2002/58/EC concerning the processing of personal data and the protection of privacy in the electronic communications sector and Regulation (EC) No 2006/2004 on cooperation between national authorities responsible for the enforcement of consumer protection laws, Official Journal of the European Union 2009, L 337/11; and Directive 2014/17/EU of the European Parliament and of the Council of 4 February 2014 on credit agreements for consumers relating to residential immovable property and amending Directives 2008/48/EC and 2013/36/EU and Regulation (EU) No 1093/2010, Official Journal of the European Union 2014, L 60/34. The Bill also includes a provision establishing the framework for inspections by the Consumer Ombudsman pursuant to Regulation (EC) No 2006/2004/EC of the European Parliament and of the Council of 27 October 2004 on cooperation between national authorities responsible for the enforcement of consumer protection laws, Official Journal of the European Union 2004, L 364/1.

13) 'fee' means a payment for a specific service, function or benefit which is linked to the purchase of a product and which is not of the nature of a payment for an independent service;
14) 'consent' means any freely given specific and informed indication of the user's wishes;
15) 'electronic mail' means any text, voice, sound or image message sent over a public communications network which can be stored in the network or in the recipient's terminal equipment until it is collected by the recipient.

*Good marketing practice*

**3.-(1)** Traders shall exercise good marketing practice with reference to consumers, other traders and public interests, but see subsection (3).

*(2)* Commercial practices directed at children and young people, or where children and young people are particularly vulnerable to the commercial practices in question, shall be designed with specific reference to their natural credulity and lack of experience and critical sense, as a result of which they are readily influenced and easy to impress, but see subsection (3).

*(3)* Where the commercial practices in question affect the consumer's economic interests, Part 2 applies instead of subsections (1) and (2). In the event that the commercial practices in question are at the same time contrary to interests that are not aimed at protecting consumers' economic interests, including taste and decency, health and safety or other interests, or in the event that the commercial practices in question are regulated by contract law, subsections (1) and (2) apply alongside Part 2.

Part 2
*Business-to-consumer commercial practices*

*Good commercial practice*

**4.-(1)** A trader shall exercise good commercial practices vis-à-vis consumers.

*Misleading actions*

**5.-(1)** A trader's commercial practice must not contain false information or in any other way, including overall presentation, deceive or be likely to deceive the average consumer, even if the information is factually correct.

*(2)* 'Misleading' under subsection (1) may be in relation to one or more of the following elements:
1) the existence or nature of the product;
2) the main characteristics of the product;
3) the extent of the trader's commitments, the motives for the commercial practice and the nature of the sales process applied;
4) any statement or symbol with direct or indirect sponsorship or approval of the trader or his products;
5) the price or the manner in which the price is calculated, or the existence of a specific price advantage;
6) the need for a service, part, replacement or repair;
7) the nature, attributes and rights of the trader or his agent;
8) the consumer's rights;
9) the trader's compliance with codes of conduct by which the trader has undertaken to be bound; or
10) confusion with any products, trade marks or distinguishing marks (business identifiers) of a competitor.

*Misleading omissions, including invitations to purchase and covert advertising*

**6.-(1)** A trader's commercial practice must not be misleading by omitting or hiding material information or by providing material information in an unclear, unintelligible, unambiguous or untimely manner.

*(2)* In case of invitations to purchase, the following information is regarded as material:
1) the main characteristics of the product, to an extent appropriate to the medium and the product;
2) the geographical address and the identity of the trader and, where another trader is acting on his behalf, the geographical address and the identity of this trader;
3) the arrangements for payment, delivery and performance of the contract, to the extent that these arrangements depart from normal industry practice;
4) the trader's method of handling complaints, to the extent it departs from normal industry practice;
5) the right of withdrawal, cancellation or return, if the consumer has such a right;
6) the price inclusive of VAT and other taxes; and
7) any additional freight, delivery or postal charges, to the extent that such charges are imposed.

*(3)* Where the nature of the product means that the price cannot reasonably be calculated in advance, the trader shall state how the price is calculated. Where freight, delivery or postal charges cannot reasonably be calculated in advance, it shall be made clear that such charges may be payable.

*(4)* A trader shall clearly identify the commercial intent of any commercial practice, including advertising. Section 8 applies correspondingly.

*(5)* When assessing whether information has been omitted under subsections (1) and (4), it shall be taken into account whether the trader uses a medium to communicate the information that allows only limited space or time and, if so, which

measures have been taken by the trader to make the information available to consumers by other means.

*Aggressive commercial practices*

**7.-(1)** In his commercial practices, a trader must not use harassment, unlawful coercion, force or undue influence that is likely to significantly impair the consumer's freedom of choice with regard to a product.

*Material distortion of the economic behaviour:*

**8.-(1)** To be in conflict with sections 4-7, the commercial practices must materially distort or be likely to materially distort the economic behaviour of the average consumer, or of the average member of the group when the commercial practices are directed to a particular group of consumers.
*(2)* Commercial practices which are likely to materially distort the economic behaviour only of a clearly identifiable group of consumers who are particularly vulnerable to this practice or the underlying product, including because of their mental or physical infirmity, age or credulity, which the trader could reasonably foresee, shall be assessed from the perspective of the average member of this group.

*Commercial practices that are always considered misleading or aggressive*

**9.-(1)** Notwithstanding whether or not this is contrary to sections 5-7, a trader must not use the commercial practices listed in Schedule 1.

Part 3

*Special forms of marketing communication*

*Unsolicited communication with specific customers*

**10.-(1)** A trader must not approach anyone by means of electronic mail, an automated calling system or a facsimile machine (fax) for the purposes of direct marketing unless the party concerned has given his prior consent. The trader must allow free and easy revocation of consent.
*(2)* Notwithstanding subsection (1), a trader that has received a customer's electronic contact details in connection with the sale of products may market own similar products to that customer by electronic mail, provided that the trader has clearly and distinctly given the customer the opportunity, free of charge and in an easy manner, of declining this both when giving his contact details to the trader and in all subsequent communications.
*(3)* Where a trader approaches anyone by electronic mail for the purposes of direct marketing, the following conditions must be met:
1) the marketing communications must be clearly identifiable as such;
2) the conditions for sales promotions must be easily accessible and be presented clearly and unambiguously;
3) the identity of the sender on whose behalf the marketing communication is made must not be disguised or concealed;
4) the recipient must not be encouraged to visit websites where the trader responsible for the website does not comply with the requirements set out in (i)-(iii); and
5) an address must be provided to which the recipient may send a request that communications cease.
*(4)* A trader must not approach a specific natural person for the purposes of direct marketing using other means of remote communication than the ones referred to in subsection (1) where
1) the person concerned has declined such communications from the trader;
2) it may be seen from a list prepared each quarter by the Central Office of Personal Registration (CPR) that the person concerned has declined direct marketing communications; or
3) the trader, by consulting the CPR, has become aware that the person concerned has declined direct market communications.
*(5)* Subsection (4)(ii) and (iii) does not apply if the person in question has previously requested the communication from the trader.
*(6)* The first time a trader communicates with a specific natural person using other means of remote communication than the ones referred to in subsection (1), the trader shall inform this person clearly and unambiguously of his right to decline direct marketing communications from the trader. Moreover, the trader must always give the person concerned the opportunity of declining such communications, free of charge and in an easy manner.
*(7)* The Minister for Business and Growth may lay down more detailed regulations governing the trader's duty to provide information under subsection (6) and the duty to offer an opportunity to decline communications to a specific natural person using other means of remote communication than the ones referred to in subsection (1).

*Commercial practices directed at children and young people*

**11.-(1)** Commercial practices directed at children and young people under the age of 18 must not directly or indirectly incite them to violence or other dangerous or inconsiderate behaviour, nor make unwarrantable use of violence, fear or superstition in

order to influence them.

*(2)* Commercial practices directed at children and young people under the age of 18 must not mention or include images of or references to intoxicants, including alcohol.

*Marking and packaging*

**12.-(1)** Following negotiation with representatives of consumers and relevant trade and industry organisations, the Minister for Business and Growth may lay down provisions to the effect that certain trade names or symbols are reserved for or shall be used for products that fulfil certain detailed stipulations, and that certain products may be sold or offered for sale only if such products or their packaging provide information about the products' content and composition, shelf life and other characteristics.

Part 4
*Disclosure obligations*

*Substantiation of factual claims*

**13.-(1)** The trader must be able to furnish evidence as to the accuracy of factual claims.

*Disclosure obligations regarding prices etc.*

**14.-(1)** In his commercial practices, a trader offering products for sale to consumers must clearly and distinctly provide information about the price of the products under the detailed regulations laid down by the Minister under subsection (2).

*(2)* Following negotiation with the minister concerned and representatives of consumers and relevant trade and industry organisations, the Minister for Business and Growth may lay down detailed regulations for the disclosure obligations under subsection (1), including

1) regulations specifying the procedure for providing price information and restrictions on the quantity of information provided;
2) regulations specifying that the unit price of the product and the use of units for individual product groups must be indicated;
3) regulations specifying that information indicating the net quantity must appear on pre-packaged retail products; and
4) regulations in order to fulfil the provisions of the Directive of the European Parliament and of the Council on services in the internal market concerning service providers' obligation to provide price information, etc. to service recipients.

*Billing obligation for work performed on a time-and-materials basis*

**15.-(1)** When a service is performed on a time-and-materials basis, the consumer shall be given an itemised bill from which he can check the price of the products included in the service. The consumer shall be given information about hourly rate, hours billed and materials used where this affects the price of the service.

*(2)* The trader may replace all or part of the information specified in subsection (1) with other information if this is agreed with the consumer or if this conforms to normal industry practice in the area in question.

*(3)* The trader shall, if the consumer so requests, provide additional information from which the consumer can check the price of the products included in the service. Such request shall be made within a reasonable time.

*(4)* Following negotiations with the minister concerned and representatives of consumers and relevant trade and industry organisations, the Minister for Business and Growth may lay down special regulations concerning derogations from subsections (1)-(3), including rules dealing with information in connection with the granting of credit.

*Fees*

**16.-(1)** The amount or the charging of a fee, cf. section 2(1)(xiii), that is not regulated by legislation in an ongoing contractual relationship may be altered to the detriment of the customer only if the conditions for this are clearly emphasised in the contract.

*(2)* A reasonable period of notice of a change in fees or the charging of new fees in an ongoing contractual relationship must be given before such fees become binding on the consumer.

*(3)* If the change in fees is substantial, or a new fee is to be charged, the consumer shall receive individual notice of this before the change takes effect. If the consumer is entitled to terminate the agreement, this must be clear from the notice, as must the conditions under which the consumer may terminate the agreement.

*Guarantees*

**17.-(1)** A trader marketing a guarantee or similar arrangement must inform the consumer, in plain intelligible language, of the following

1) the contents of the guarantee, including any limitations and obligations under the guarantee;
2) the particulars necessary for making claims under the guarantee; and
3) that the consumer's essential rights under the law are not affected by the guarantee.

*(2) If marketing communication is in Danish, the terms of the guarantee must be in Danish.*

*Marketing of credit agreements*

**18.-(1)** Any marketing concerning credit agreements to consumers which is not subject to section 19, and which indicates an interest rate or any figures relating to the cost of the credit must include the following standard information:

1) the borrowing rate, indicating whether this is fixed or variable or a combination of both, together with particulars of any charges included in the total cost of the credit to the consumer;
2) the total amount of credit;
3) the annual percentage rate of charge (APRC), calculated in accordance with the Credit Agreements Act;
4) the duration of the credit agreement;
5) the cash price and the amount of any advance payment in case of a credit in the form of deferred payment for a specific product or service;
6) the total amount payable by the consumer and the amount of instalments.

*(2) The standard information, cf. subsection (1), shall be specified in a clear, concise and prominent way by means of a representative example.*

*(3) Where the conclusion of a contract regarding an ancillary service relating to the credit agreement, including insurance, is compulsory in order to obtain the credit or obtain it on the terms and conditions marketed, and the cost of that service cannot be determined in advance, the obligation to enter into that contract shall also be stated in a clear, concise and prominent way, together with the annual percentage rate of charge (APRC).*

*(4) A credit intermediary must indicate in marketing and documentation intended for consumers the extent of his powers, including whether he works exclusively with one or more creditors or as an independent broker.*

*(5) The Minister for Business and Growth lays down regulations concerning information on risk in relation to credit agreements.*

*Marketing of mortgage credit agreements*

**19.-(1)** Any marketing concerning mortgage credit agreements which indicates an interest rate or any figures relating to the cost of the credit must include the following standard information:

1) the identity of the mortgage creditor or the mortgage credit intermediary;
2) the mortgage or other security by which the mortgage credit agreement is secured;
3) the borrowing rate, indicating whether this is fixed or variable or a combination of both, together with particulars of any charges included in the total cost of the credit;
4) the total amount of credit;
5) the annual percentage rate of charge (APRC) which shall be included in marketing communications at least as prominently as any interest rate indication for the credit;
6) the duration of the mortgage credit agreement;
7) the amount of the instalments;
8) the total amount and the number of instalments payable by the consumer;
9) a warning regarding the fact that possible fluctuations of the exchange rate could affect the amount payable if loans are marketed in Denmark in currencies other than Danish kroner.

*(2) The standard information, cf. subsection (1), shall be specified in a clear, concise and prominent way. The standard information, cf. subsection (1)(iii)-(viii), shall be specified by means of a representative example using the standard assumptions laid down by the Minister for Business and Growth. Where the credit is offered only under assumptions other than the standard assumptions laid down by the Minister for Business and Growth, the commonly used assumptions for the marketed credit must be used in the indication of the representative example.*

*(3) Where the conclusion of a contract regarding an ancillary service relating to the credit agreement, in particular insurance, is compulsory in order to obtain the credit or obtain it on the terms and conditions marketed, and the cost of that service cannot be determined in advance, the obligation to enter into that contract shall also be stated in a clear, concise and prominent way, together with the annual percentage rate of charge (APRC).*

*(4) The information referred to in subsections (1) and (3) shall be easily legible or clearly audible as appropriate, depending on the medium used for marketing.*

*(5) The Minister for Business and Growth lays down detailed regulations concerning what should be considered to be a representative example in the marketing of mortgage credit agreements.*

Part 5
*Business-to-business relations between traders*

*Misleading and improper business-to-business commercial practices*

**20.-(1)** The commercial practices of a trader must not be likely to mislead so that these may be assumed to affect other traders' economic behaviour or harm a competitor.

*(2) In the assessment of whether the commercial practices of a trader are misleading under subsection (1), the overall*

commercial practices concerned shall be taken into account, including information about the following matters:
1) characteristics of the product;
2) the price or the manner in which the price is calculated, and the conditions for delivery of products; and
3) status, attributes and rights of the advertiser.

*(3)* A trader's business-to-business commercial practices must not be misleading or improper.

*Comparative advertising*

**21.-(1)** Comparative advertising means any advertising which explicitly or by implication identifies a competitor or products offered by a competitor.

*(2)* Comparative advertising, cf. subsection (1), is permitted under this Act when the following conditions are met:
1) it is not misleading;
2) it concerns products meeting the same needs or intended for the same purpose;
3) it objectively compares one or more specific, relevant, verifiable and representative features of these products, which may include price;
4) it does not create confusion in the market between the advertiser and a competitor or between the advertiser's trade marks, trade names, other distinguishing marks or products and those of a competitor;
5) it does not discredit or denigrate the trade marks, trade names, other distinguishing marks, products, activities or circumstances of a competitor;
6) for products with designation of origin, it relates in each case to products with the same designation;
7) it does not take unfair advantage of the reputation of a trade mark, trade name or other distinguishing marks of a competitor or of the designation of origin of competing products; and
8) it does not represent products as imitations or replicas of products bearing a protected trade mark or trade name.

*Business identifiers*

**22.-(1)** Traders must not use business identifiers and similar devices that do not belong to them, nor use their own business identifiers in a manner that is likely to cause confusion with those of others.

*Trade secrets and technical drawings etc.*

**23.-(1)** An individual who is under contract of service to or working in cooperation with a trader or is carrying out an assignment on his behalf must not obtain knowledge of or access to the trade secrets of the trader in an improper manner.

*(2)* If the individual concerned has obtained knowledge of or access to the trade secrets of the trader in a lawful manner, he must not (unless authorised) pass on or make use of such secrets. This prohibition applies for three years after the end of the contract, cooperation or assignment.

*(3)* Subsections (1) and (2) apply correspondingly to other persons who have lawful access to the trader's business.

*(4)* A person who in the course of work or for other commercial purpose has been entrusted with technical drawings, specifications, formulae, models or the like may not make use of such material or put others in a position to do so without authorisation.

*(5)* Traders may not make use of information or drawings or the like if knowledge of or access to this information or these drawings or the like has been obtained in conflict with subsections (1)-(4).

Part 6
*Legal remedies*

**24.-(1)** Actions in conflict with this Act may be prohibited by judgments. Concurrently with this or subsequently, such orders may be imposed by judgments as may be considered necessary to ensure
(i) compliance with the prohibition, including through provision that agreements entered into in conflict with a prohibition are invalid; and
(ii) restitution of the state of affairs existing before the unlawful action, including destruction or recall of products and issue of information or correction of statements.

*(2)* Actions in conflict with this Act give rise to liability to pay damages under the general rules of Danish law.

*(3)* Any person who intentionally or negligently infringes or exploits unwarrantably the rights of another person in conflict with this Act shall pay reasonable compensation.

*(4)* If infringement or exploitation of rights in conflict with the Act has taken place neither intentionally nor through negligence, the offender shall pay compensation in accordance with subsection (3) to the extent deemed reasonable.

Part 7
*The activities of the Consumer Ombudsman*

*The Consumer Ombudsman*

**25.-(1)** It is the responsibility of the Consumer Ombudsman, especially in the interests of consumers, to monitor compliance with this Act and regulations issued pursuant to this Act.

*(2)* The Consumer Ombudsman may require the disclosure from anyone of all details considered necessary for the Consumer Ombudsman's activities, including a decision as to whether a matter falls within the purview of this Act. The Consumer Ombudsman may require such disclosure within a short time limit where comparative advertising is concerned or when considered necessary under the circumstances.

*(3)* The Consumer Ombudsman is appointed by the Minister for Business and Growth for a period of up to six years which may be extended by up to a total of three years. After the expiry of this period, the Consumer Ombudsman may be reappointed only following public advertisement. In the event of reappointment, the first sentence is applied correspondingly. The Consumer Ombudsman may be discharged without application only if such discharge is for health reasons, or if the individual concerned is unfit to remain in the post as a result of criminality, misconduct in service or fraud. The appointment automatically ceases at the end of the month in which the individual concerned reaches the age of 70. The Consumer Ombudsman shall fulfil the general conditions for appointment as a judge.

*(4)* No appeal against the Consumer Ombudsman's rulings under this Act may be brought before any another administrative authority.

*(5)* The Minister for Business and Growth lays down detailed regulations governing the activities of the Consumer Ombudsman.

*Digitalisation of the activities of the Consumer Ombudsman*

**26.-(1)** Digital communication is considered to have been received once it is available to the addressee.

*(2)* The Minister for Business and Growth may lay down regulations specifying that written communication to and from the Consumer Ombudsman concerning matters covered by this Act or by regulations issued pursuant to this Act must take place digitally.

*(3)* The Minister for Business and Growth may lay down detailed regulations governing digital communication, including the use of specific IT systems, particular digital formats and digital signature etc.

*(4)* The Minister for Business and Growth may lay down regulations permitting the Consumer Ombudsman to issue decisions and other documents pursuant to this Act or pursuant to regulations issued pursuant to this Act without a signature, with a mechanically or similarly reproduced signature, or using a technology that ensures precise identification of the person issuing the decision or document. Such decisions and other documents shall rank equally with decisions and documents with a personal signature.

*(5)* The Minister for Business and Growth may lay down regulations specifying that decisions and other documents made or issued exclusively on the basis of electronic data processing may be made or issued merely designating the Consumer Ombudsman as the sender.

*On-site inspections*

**27.-(1)** The Consumer Ombudsman may carry out inspections for the purpose of processing complaints forwarded from enforcement authorities in other EU member states pursuant to Regulation (EC) No 2006/2004 on consumer protection cooperation, and which concern infringements of directives for which the Consumer Ombudsman has been appointed the competent authority.

*(2)* The Consumer Ombudsman's inspections, cf. subsection (1), may take place only after a court order has been obtained.

*(3)* Access for inspections involves the Consumer Ombudsman obtaining access to the premises and means of transport of a company or association in order to familiarise himself with and make copies of any information, including marketing materials, accounts, financial records, books and other business records, regardless of the information medium. The Consumer Ombudsman may require oral explanations of the facts in connection with the inspection. The Consumer Ombudsman may not require oral explanations where the Consumer Ombudsman has a suspicion based on specific and articulable facts that a criminal offence has been committed, providing grounds for bringing charges. The Consumer Ombudsman may also require individuals included in the inspection to show the contents of their pockets, bags etc. in order for the Consumer Ombudsman to familiarise himself with such contents and make copies where applicable.

*(4)* Where the information of a company or association is stored at or processed by an external data processor, the Consumer Ombudsman may obtain access to the premises of the external data processor in order to familiarise himself with and make copies of this information, cf. subsection (3). Such access assumes that it is not possible for the Consumer Ombudsman to obtain access to the information directly from the company or association which is the subject of the inspection.

*(5)* The Consumer Ombudsman may obtain a copy of the data content from electronic media covered by the inspection for subsequent review of the copy. The data obtained must be sealed or otherwise protected against reading before the inspection is completed. The subject of the inspection may demand that it or a representative appointed by it is present when the data obtained is made available for reading and that the Consumer Ombudsman reviews the material obtained. Within 40 days of the end of the inspection, the Consumer Ombudsman is obliged to provide a copy of any information the Consumer Ombudsman may have extracted from the data obtained to the subject of the inspection. When the review of the data obtained has been completed, the data must be protected against reading. If the Consumer Ombudsman assesses that the material does not contain evidence of an

infringement of the regulations referred to in subsection (1), the data obtained must be deleted. If the Consumer Ombudsman decides to proceed with the case, the data collected shall be deleted when the case has been finally decided.

*(6)* If the circumstances of a company or association mean that it is not possible for the Consumer Ombudsman to obtain access to or make copies of the information on the day of the inspection, cf. subsections (3)-(5), the Consumer Ombudsman may seal the relevant business premises and information for up to three working days after the inspection.

*(7)* Under the same conditions as in subsection (6), the Consumer Ombudsman may remove information or the medium on which the information is stored in order to copy it. The material removed by the Consumer Ombudsman must be returned to the company or association no later than three working days after the inspection, together a set of copies of the information which the Consumer Ombudsman has removed for the purpose of a more detailed review.

*(8)* In special cases, the time limits in subsections (5), (6) and (7) may be extended.

*(9)* The police provide assistance in the exercise of powers under subsections (1) and (3)-(7). Following negotiation with the Minister for Justice, the Minister for Business and Growth may lay down detailed regulations for this assistance.

*The negotiation principle*

**28.-(1)** The Consumer Ombudsman shall seek by negotiation to influence traders to act in accordance with the good practice principles and to observe this Act in other respects.

*(2)* If a trader disregards an undertaking given to the Consumer Ombudsman after negotiation under subsection (1), the Consumer Ombudsman may impose such orders on the trader as may be considered necessary to ensure compliance with the undertaking.

*Guidelines*

**29.-(1)** Following negotiation with representatives of consumers and relevant trade and industry organisations, the Consumer Ombudsman seeks to influence the conduct of traders by the preparation and issue of guidelines for marketing in specified areas that must be considered important, especially in the interests of consumers.

*(2)* Notwithstanding subsection (1), the Consumer Ombudsman may not issue guidelines that are directed solely at businesses covered by the Financial Business Act.

*Advance indication*

**30.-(1)** At the request of a trader, the Consumer Ombudsman may give a statement regarding his assessment of the lawfulness of contemplated marketing arrangements, unless an opinion would be subject to unusual doubt or other special circumstances exist. An advance indication does not amount to a binding opinion on the lawfulness of the arrangement concerned.

*(2)* Once the Consumer Ombudsman has delivered an advance indication to a trader to the effect that he thinks a contemplated arrangement would be lawful, the Consumer Ombudsman may not interfere on his own initiative with an arrangement covered by the advance indication and implemented within a reasonable time from its delivery.

*(3)* The Minister for Business and Growth may lay down detailed regulations concerning advance indication fees.

Part 8
*The activities of the Danish Competition and Consumer Authority*

**31.-(1)** The Danish Competition and Consumer Authority may conduct and publish comparative tests of products.

*(2)* In the testing referred to in subsection (1), the Danish Competition and Consumer Authority may collect information anonymously.

Part 9
*Legal proceedings and enforcement measures*

*Legal proceedings*

**32.-(1)** Anyone with a legal interest therein may bring a case concerning prohibitions, orders, damages and compensation under section 24.

The Consumer Ombudsman may bring a case concerning prohibitions and orders under section 24(1) and, if requested, bring a case concerning damages and compensation.

*(2)* The Consumer Ombudsman may issue an order if an action is clearly in conflict with this Act and cannot be changed by negotiation.

*(3)* A party upon whom an order is imposed may require that it be considered by the courts. A request to this effect shall be submitted to the Consumer Ombudsman in writing within four weeks of notification of the party concerned of the order. The Consumer Ombudsman shall bring the case to court under the rules governing civil administration of justice within one week of receiving the request.

*(4)* A request under subsection (3) has no delaying effect, but the court may find that the party concerned may continue with the action covered by the order while the case is pending.

*(5)* If a judgment by which an order is found not lawful is appealed, the court that pronounced the judgment or the court to which the case has been brought may decide that the party concerned may not practise the action covered by the order during the appeal case.

*(6)* If a charge is preferred for infringement of this Act, the prosecution of the charge will be assigned to the Consumer Ombudsman if he so requests.

*Duty to provide information on time limitation*

**33.** If deemed necessary for protecting consumers against a loss of rights, the Consumer Ombudsman may, following negotiation with the trader, issue an order specifying a duty to inform relevant customers about their legal position in relation to time limitation.

*Actions for damages*

**34.** If a majority of consumers have a uniform claim for damages as a result of infringement of the provisions of this Act, the Consumer Ombudsman may, if requested, treat this as a single claim.

*Collective actions*

**35.** The Consumer Ombudsman may be appointed as group representative in a collective action, cf. Part 23 a of the Administration of Justice Act.

*Interim prohibitions*

**36.-(1)** Where there is an obvious risk that the purpose of a prohibition as referred to in section 24(1) will be defeated if a court decision must be awaited, the Consumer Ombudsman may issue an interim prohibition. A case to affirm the prohibition shall be brought not later than the next working day. The rules in section 413(1)(ii), section 414, section 430 and section 641(1)-(3) and (5) of the Administration of Justice Act apply correspondingly, and the rules in section 636, section 638 and 422(3) apply subject to the necessary exemptions.

*(2)* If a case for affirmation of a prohibition under subsection (1) cannot be decided by judgment within five working days of the case being brought, the court may decide, during the preparation of the case and before the expiry of the above time limit, that the prohibition shall continue in force. Before such decision, the court will, if possible, give the parties the opportunity to express their views. If the prohibition is not affirmed before the expiry of the time limit, it will lapse.

*Penalty and prosecution*

**37.-(1)** Non-observance of a prohibition or order imposed by the court or an order imposed by the Consumer Ombudsman under section 28(2), section 32(2) or section 33 is punishable by a fine or imprisonment of up to four months. However, non-observance of an order to repay a payment received does not carry a penalty.

*(2)* A party who omits to disclose information required under section 25(2) or section 27(3), second sentence, or under circumstances covered by this Act gives the Consumer Ombudsman incorrect or misleading information, shall be liable to a fine unless a more severe penalty is prescribed under other legislation.

*(3)* Infringement of the provisions of section 5(1), section 6(1),(3) and (4), sections 7 and 9-11, section 14(1), section 15, section 16(3), section 18 and section 19, section 20(1) and section 21 and deliberate infringement of section 22 is punishable by a fine unless a more severe penalty is prescribed under other legislation.

*(4)* Infringement of section 20(1), section 21 and section 22 is subject to private prosecution.

*(5)* Infringement of section 23 is punishable by a fine or imprisonment of up to eighteen months, unless a more severe penalty is prescribed under section 299 a of the Danish Penal Code. Prosecution will take place only at the request of the injured party.

*(6)* Regulations issued pursuant to this Act may prescribe penalties in the form of fines for infringement of such regulations.

*(7)* Companies etc. (legal persons) may be subject to criminal liability under the rules of Part 5 of the Danish Penal Code.

*Fine notice*

**38.-(1)** The Minister for Business and Growth may, following negotiation with the Minister for Justice, lay down regulations specifying that the Consumer Ombudsman, in specific cases on infringement of this Act or regulations issued pursuant to this Act, indicates in a fine notice that the case may be settled out-of-court if the party in contravention pleads guilty of the infringement and states that he is willing to pay a fine specified in the fine notice within a specified time limit. Such time limit may be extended by the Consumer Ombudsman if requested.

*(2)* The rules of section 834(1)(ii) and (iii) and 834(2) of the Administration of Justice Act on requirements for the content of an indictment and on suspects not being under any obligation to make statements apply correspondingly to fine notices.

*(3)* If the fine notice is accepted, any further prosecution will cease. Acceptance of a fine shall have the effect of a judgment.

Part 10
*Transferred powers*

**39.** The Minister for Business and Growth may transfer his powers under this Act to an authority under the Ministry. This does not apply to powers under section 25(5). If the Minister transfers his powers to an authority under the Ministry, he may lay down rules governing the right of appeal, including the stipulation that appeals may not be brought before another administrative authority.

Part 11
*Entry into force etc.*

*Entry into force*

**40.-(1)** This Act enters into force on 1 July 2017.
*(2)* The Marketing Practices Act, cf. Consolidated Act no. 1216 of 25 September 2013, is repealed on 1 July 2017.
   *(3)* Regulations laid down pursuant to the Marketing Practices Act, cf. Consolidated Act no. 1216 of 25 September 2013, shall remain in force until they are repealed or superseded by rules and regulations issued pursuant to this Act. Infringements of such rules and regulations are punishable by fine in accordance with the previous rules.

*The Faroe Islands and Greenland*

**41.** This Act does not apply to the Faroe Islands and Greenland.

Part 12
*Amendment of other legislation*

   **42.** The Administration of Justice Act, cf. Consolidated Act no. 1257 of 13 October 2016, as most recently amended by section 1 of Act No. 203 of 28 February 2017, is amended as follows:

**1.** In *section 653(2)(xiv),* "section 1 of the Marketing Practices Act" is amended to: "sections 3 and 4 of the Marketing Practices Act".

**43.** The Danish Penal Code, cf. Consolidated Act no. 1052 of 4 July 2016, as amended by Act no. 1723 of 27 December 2016, section 1 of Act
no. 1728 of 27 December 2016 and section 3 of Act no. 189 of 27 February 2017, is amended as follows:

**1.** In *section 299 a,* "section 19 of the Marketing Practices Act" is amended to: "section 23 of the Marketing Practices Act".

   **44.** Act no. 429 of 31 May 2000 on Processing of Personal Data, as amended, inter alia, by section 2 of Act no. 519 of 6 June 2007 and most recently by section 1 of Act no. 639 of 12 June 2012, is amended as follows:

**1.** In *section 6(2), second sentence,* "section 6 of the Marketing Practices Act" is amended to: "section 10 of the Marketing Practices Act".

**2.** In *section 12(1)(iii), second sentence,* "section 6 of the Marketing Practices Act" is amended to: "section 10 of the Marketing Practices Act".

**3.** In *section 36(3),* "section 6 of the Marketing Practices Act" is amended to: "section 10 of the Marketing Practices Act" and "section 6(7) of the Marketing Practices Act" is amended to:
"section 10(7) of the Marketing Practices Act".

   **45.-(1)** The Financial Business Act, cf. Consolidated Act no. 174 of 31 January 2017, as most recently amended by section 1 of Act no. 1549 of 13 December 2016, is amended as follows:

**1.** In *section 348(1), third sentence,* "section 20, section 22(2), section 23(1), section 27(1) and section 28 of the Marketing Practices Act" is amended to:
"section 24, section 25(2), section 28(1), section 32(1) and section 34 of the Marketing Practices Act".

**2.** In *section 395,* "section 17 of the Marketing Practices Act" is amended to: "section 29 of the Marketing Practices Act".

**46.** The Investment Associations etc. Act, cf. Consolidated Act no. 1051 of 25 August 2015, as most recently amended by section 2 of Act no.
1541 of 13 December 2016, is amended as follows:

**1.** In *section 170(1), second sentence,* "section 20, section 22(2), section 23(1), section 27(1) and section 28 of the Marketing Practices Act" is amended to:
"section 24, section 25(2), section 28(1), section 32(1) and section 34 of the Marketing Practices Act".

**47.** The Act on Financial Advisors and Mortgage Credit Intermediaries, cf. Consolidated Act no. 1079 of 5 July 2016, as amended by section 5 of Act no. 1549 of 13 December 2016, is amended as follows:

**1.** In *section 11(5),* "section 20, section 22(2), section 23(1), section 27(1) and section 28 of the Marketing Practices Act" is amended to: "section 24, section 25(2), section 28(1), section 32(1) and section 34 of the Marketing Practices Act".

**48.-(1)** The Property Credit Companies Act, cf. Consolidated Act no. 1078 of 5 July 2016, as amended by section 9 of Act no. 1549 of 13 December 2016, is amended as follows:

**1.** In *section 12(2), third sentence,* "section 20, section 22(2), section 23(1), section 27(1) and section 28 of the Marketing Practices Act" is amended to:
"section 24, section 25(2), section 28(1), section 32(1) and section 34 of the Marketing Practices Act".

**49.** Act no. 375 of 27 April 2016 on payment accounts (the Payment Accounts Act) is amended as follows:

**1.** In *section 15, second sentence,* "section 20, section 22(2), section 23(1), section 27(1) and section 28" is amended to: "section 24, section 25(2), section 28(1), section 32(1) and section 34".

**50.** The Securities Trading Act, cf. Consolidated Act no. 251 of 21 March 2017, is amended as follows:

**1.** In *section 3(3), second sentence,* "section 20, section 22(2), section 23(1), section 27(1) and section 28 of the Marketing Practices Act" is amended to:
"section 24, section 25(2), section 28(1), section 32(1) and section 34 of the Marketing Practices Act".

*Issued at Amalienborg, 3 May 2017*

Under Our Royal Hand and Seal MARGRETHE R.

/ Brian Mikkelsen

# Schedule 1
### Specific commercial practices that are always considered misleading or aggressive
*Misleading commercial practices*

1) Claiming to be a signatory to a code of conduct when the trader is not.
2) Displaying a trust mark, quality mark or equivalent without having obtained the necessary authorisation.
3) Claiming that a code of conduct has an endorsement from a public or other body which it does not have.
4) Claiming that a trader (including his commercial practices) or a product has been approved, endorsed or authorised by a public or private body when he/it has not or making such a claim without complying with the terms of the approval, endorsement or authorisation.
5) Making an invitation to purchase products at a specified priced without disclosing the existence of any reasonable grounds the trader may have for believing that he will not be able to offer for supply or to procure another trader to supply, those products or equivalent products at that price for a period that is, and in quantities that are, reasonable having regard to the product, the scale of advertising of the product and the price offered (bait advertising).
6) Making an invitation to purchase products at a specified price and then: refusing to show the advertised item to consumers; or refusing to take orders for it or deliver it within a reasonable time; or demonstrating a defective sample of it with the intention of promoting a different product (bait and switch).
7) Falsely stating that a product will only be available for a very limited time, or that it will only be available on particular terms for a very limited time, in order to elicit an immediate decision and deprive consumers of sufficient opportunity or time to make an informed choice.
8) Undertaking to provide after-sales service to consumers with whom the trader has communicated prior to a transaction in a language which is not an official language of the Member State where the trader is located and then making such service available only in another language without clearly disclosing this to the consumer before the consumer is committed to the

transaction.
9) Stating or otherwise creating the impression that a product can legally be sold when it cannot.
10) Presenting rights given to consumers in law as a distinctive feature of the trader's offer.
11) Using editorial content in the media to promote a product when the trader has paid for the promotion without making that clear in the content or by images or sounds clearly identifiable by the consumer. This is without prejudice to Council Directive 89/552/EEC, as codified by Directive 2010/13/EU.
12) Making a materially inaccurate claim concerning the nature and extent of the risk to the personal security of the consumer or his family if the consumer does not purchase the product.
13) Promoting a product similar to a product made by a particular manufacturer in such a manner as deliberately to mislead the consumer into believing that the product is made by that same manufacturer when it is not.
14) Establishing, operating or promoting a pyramid promotional scheme where a consumer gives consideration for the opportunity to receive compensation that is derived primarily from the introduction of other consumers into the scheme rather than from the sale or consumption of products.
15) Claiming that the trader is about to cease trading or move premises when he is not.
16) Claiming that products are able to facilitate winning in games of chance.
17) Falsely claiming that a product is able to cure illnesses, dysfunction or malformations.
18) Passing on materially inaccurate information on market conditions or on the possibility of finding the product with the intention of inducing the consumer to acquire the product at conditions less favourable than normal market conditions.
19) Claiming in a commercial practice to offer a competition or prize promotion without awarding the prizes described or a reasonable equivalent.
20) Describing a product as 'gratis', 'free', 'without charge' or similar if the consumer has to pay anything other than the unavoidable cost of responding to the commercial practice and collecting or paying for delivery of the item.
21) Including in marketing material an invoice or similar document seeking payment which gives the consumer the impression that he has already ordered the marketed product when he has not.
22) Falsely claiming or creating the impression that the trader is not acting for purposes relating to his trade, business, craft or profession, or falsely representing oneself as a consumer.
23) Creating the false impression that after-sales service in relation to a product is available in a Member State other than the one in which the product is sold.

*Aggressive commercial practices*

24) Creating the impression that the consumer cannot leave the premises until a contract is formed.
25) Conducting personal visits to the consumer's home ignoring the consumer's request to leave or not to return except in circumstances and to the extent justified, under national law, to enforce a contractual obligation.
26) Making persistent and unwanted solicitations by telephone which are not subject to the prohibition in section 4 of the Consumer Contracts Act, or by fax, e-mail or other remote media except in circumstances and to the extent justified, under national law, to enforce a contractual obligation.
27) Requiring a consumer who wishes to claim on an insurance policy to produce documents which could not reasonably be considered relevant as to whether the claim was valid, or failing systematically to respond to pertinent correspondence, in order to dissuade a consumer from exercising his contractual rights.
28) Including in an advertisement a direct exhortation to children to buy advertised products or persuade their parents or other adults to buy the advertised products for them. This provision is without prejudice to Article 9(1)(g) of Directive 2010/13/EU (Audiovisual Media Services Directive).
29) Demanding immediate or deferred payment for or the return or safekeeping of products supplied by the trader, but not solicited by the consumer except where the product is a substitute supplied in conformity with Article 7(3) of Directive 97/7/EC (inertia selling).
30) Explicitly informing a consumer that if he does not buy the product or service, the trader's job or livelihood will be in jeopardy.
31) Creating the false impression that the consumer has already won, will win, or will on doing a particular act win, a prize or other equivalent benefit, when in fact either: there is no prize or other equivalent benefit, or taking any action in relation to claiming the prize or other equivalent benefit is subject to the consumer paying money or incurring a cost.