**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

YANGTZE MEMORY TECHNOLOGIES,
INC. and YANGTZE MEMORY
TECHNOLOGIES CO., LTD.,

                          Plaintiffs,

v.

STRAND CONSULT ApS
(d/b/a CHINA TECH THREAT),

and

ROSLYN LAYTON,

                          Defendants.

Case No. 1:25-cv-3554

Hon. Carl J. Nichols

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT**

Plaintiffs Yangtze Memory Technologies, Inc. and Yangtze Memory Technologies Co.,

Ltd. (together, "YMTC") respectfully oppose Defendants Strand Consult ApS' and Roslyn

Layton's (together, "Defendants") Motion to Dismiss (Dkt. 22) and submit the accompanying

Memorandum of Points and Authorities.  For the reasons set forth therein, the Court should deny

Defendants' Motion.  A Proposed Order is attached.

YMTC requests an oral hearing for its opposition under Local Rule 7(f).

Dated: March 16, 2026

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

David Eiseman (*pro hac vice*)
50 California Street, 22nd Floor
San Francisco, CA 94111-4788
(415) 875-6600
davideiseman@quinnemanuel.com

Robert M. Schwartz (D.C. Bar No. 412049)
Aaron Perahia (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000
robertschwartz@quinnemanuel.com
aaronperahia@quinnemanuel.com

Samuel P. Nitze (*pro hac vice)*
295 Fifth Avenue, 9th Floor
New York, New York 10016
(212) 849-7000
samuelnitze@quinnemanuel.com

David Needham (D.C. Bar No. 1017372)
Jaime Luis Lopez (*pro hac vice*)
555 13th St. NW, Ste. 600
Washington, D.C. 20004
(202) 538-8000
davidneedham@quinnemanuel.com
jaimelopez@quinnemanuel.com

Evan Pearson (*pro hac vice*)
300 West Sixth Street, Suite 2010
Austin, Texas 78701-3901
(737) 667-6100
evanpearson@quinnemanuel.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

YANGTZE MEMORY TECHNOLOGIES,
INC. and YANGTZE MEMORY
TECHNOLOGIES CO., LTD.,

                       Plaintiffs,

v.

STRAND CONSULT ApS
(d/b/a CHINA TECH THREAT),

and

ROSLYN LAYTON,

                       Defendants.

Case No. 1:25-cv-3554

Hon. Carl J. Nichols

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

ALLEGATIONS OF THE COMPLAINT...............................................................................3

    A.     Micron Funds a Disinformation Campaign Against YMTC, Using
           Defendants as Its Instruments. ...............................................................................3

    B.     Defendants Publish False Statements They Knew Were Impossible. ......................5

    C.     YMTC Sues in California; Defendants Tell the Court That D.C. Lacks
           Jurisdiction Over Them While Their Terms of Use Provide Otherwise. ................7

    D.     YMTC Discovers the Forum Selection Clause and Files in This District. ..............8

ARGUMENT ...........................................................................................................................9

I.     THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS. ...................9

    A.     Defendants Consented to Personal Jurisdiction in the Forum Selection
           Clause.......................................................................................................................9

           1.     The Forum Selection Clause Covers This Dispute. ...................................10

           2.     Layton Is Bound by the Forum Selection Clause. ....................................13

    B.     This Court Also Has Personal Jurisdiction Under the Long-Arm Statute. ............13

II.    THE RULINGS IN THE PRIOR ACTION DO NOT PRECLUDE THIS
      ACTION. .........................................................................................................................15

    A.     Neither the Prior *Forum Non Conveniens* Dismissal Nor Any Independent
           Determination Requires Dismissal. .......................................................................15

           1.     Preclusion Does Not Apply to the *Forum Non Conveniens*
                  Dismissal...................................................................................................15

           2.     *Forum Non Conveniens* Does Not Independently Require
                  Dismissal...................................................................................................19

    B.     Judge Wise's Transfer Denial Does Not Preclude YMTC's Jurisdictional
           Allegations Here. ...................................................................................................20

            1.     The "Same Issue" Element Fails Because Contractual Consent and
                  Minimum Contacts Rest on Different Legal Standards............................21

i

2.      The "Actually and Necessarily Determined" Element Fails
        Because the Jurisdictional Finding Was Incidental to the Judgment.........23

        C.      Judicial Estoppel Does Not Bar YMTC's Jurisdictional Allegations....................24

III.    YMTC HAS STANDING TO BRING THIS ACTION.....................................................26

        A.      YMTC Has Properly Pleaded Article III Standing. ................................................26

        B.      The Complaint Sufficiently Pleads Lanham Act Standing. ...................................30

IV.     YMTC HAS STATED A PLAUSIBLE LANHAM ACT CLAIM..................................35

        A.      Defendants Engaged in Commercial Speech. ........................................................35

        B.      The Statements Were False or Misleading. ...........................................................40

V.      IF NECESSARY, THE COURT SHOULD GRANT LEAVE TO AMEND. ..................44

CONCLUSION................................................................................................................................44

## TABLE OF AUTHORITIES

**Page**

### Cases

*Abramson v. Wallace*,
706 F. Supp. 1 (D.D.C. 1989) .........................................................................................14

\**Aenergy, S.A. v. Republic of Angola* (*Aenergy III*),
678 F. Supp. 3d 147 (D.D.C. 2023) .................................................................................16

*Aenergy, S.A. v. Republic of Angola* (*Aenergy IV*),
123 F.4th 1351 (D.C. Cir. 2024) ...........................................................................15, 16, 17

*AMA Multimedia, LLC v. Madon*,
2020 WL 5096476 (D. Nev. Aug. 28, 2020) ...................................................................22

\**Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ...................................................................................37, 43

\**Aristotle Int'l, Inc. v. NGP Software, Inc.*,
714 F. Supp. 2d 1 (D.D.C. 2010) .............................................................................35, 40, 43

*ATB Marine, Inc. v. AES Puerto Rico, L.P.*,
2025 WL 1191104 (D. Del. Apr. 24, 2025) ....................................................................20

\**Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
571 U.S. 49 (2013) ........................................................................16, 17, 18, 19, 20

*Azima v. RAK Inv. Auth.*,
926 F.3d 870 (D.C. Cir. 2019) .................................................................................10, 11

*Barrett v. Atlantic Monthly Grp.*,
2024 WL 4119400 (D.D.C. Sept. 9, 2024) .....................................................................34

*Bautista v. Star Cruises*,
696 F. Supp. 2d 1274 (S.D. Fla. 2010) ...........................................................................25

*Beach TV Props., Inc. v. Solomon*,
254 F. Supp. 3d 118 (D.D.C. 2017) ..........................................................................25, 26

*Beall v. Edwards Lifesciences LLC*,
310 F. Supp. 3d 97 (D.D.C. 2018) .................................................................................11

*Bobby v. Bies*,
556 U.S. 825 (2009) ........................................................................................................23

*Bolger v. Youngs Drug Prods. Corp.,*
   463 U.S. 60 (1983)..............................................................................................38

*Brightwell Dispensers Ltd. v. Dongguan ISCE Sanitary Ware Indus. Co.,*
   2019 WL 7037493 (D.D.C. Dec. 20, 2019)..........................................................14

*Bronner v. Duggan,*
   324 F.R.D. 285 (D.D.C. 2018).............................................................................44

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
   447 U.S. 557 (1980)......................................................................................35, 36

*Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.,*
   228 F.3d 24 (1st Cir. 2000)..................................................................................43

*CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n,*
   2016 WL 5118530 (S.D. Cal. Sept. 21, 2016).......................................................38

*Democracy Partners, LLC v. Project Veritas Action Fund,*
   2025 WL 1088090 (D.D.C. Apr. 11, 2025).............................................................32

*Farah v. Esquire Magazine, Inc.,*
   736 F.3d 528 (D.C. Cir. 2013)..............................................................................38

*Foman v. Davis,*
   371 U.S. 178 (1962).............................................................................................44

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
   592 U.S. 351 (2021).............................................................................................15

*Geomatrix, LLC v. NSF Int'l,*
   629 F. Supp. 3d 691 (E.D. Mich. 2022).................................................................32

*Gulf Oil Corp. v. Gilbert,*
   330 U.S. 501 (1947).............................................................................................16

*Hall v. Clinton,*
   285 F.3d 74 (D.C. Cir. 2002).................................................................................22

*Hayes v. FM Broad. Station WETT,*
   930 F. Supp. 2d 145 (D.D.C. 2013)......................................................................14

*Hoult v. Hoult,*
   157 F.3d 29 (1st Cir. 1998)...................................................................................24

*Jackson v. Off. of the Mayor of D.C.,*
   911 F.3d 1167 (D.C. Cir. 2018).............................................................................21

*Jones v. Kirchner*,
  835 F.3d 74 (D.C. Cir. 2016)...................................................................................23

*Kabbash v. Jewelry Channel, Inc. USA*,
  2016 WL 9132930 (N.D. Cal. Feb. 22, 2016) ..........................................................11

*KLEO AG v. Rivada Networks, Inc.*,
  148 F.4th 741 (D.C. Cir. 2025)................................................................................29

*Kotan v. Pizza Outlet, Inc.*,
  400 F. Supp. 2d 44 (D.D.C. 2005) ...........................................................................13

*Kremer v. Chem. Constr.*,
  456 U.S. 461 (1982).................................................................................................22

*Lee v. SEED Pub. Charter Sch.*,
  2020 WL 4923619 (D.D.C. Aug. 1, 2020) ...............................................................28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014).........................................................................26, 30, 31, 40

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).................................................................................................26

*M3 USA Corp. v. Qamoum*,
  2021 WL 2324753 (D.D.C. June 7, 2021).................................................................9

*Maffick LLC v. Facebook, Inc.*,
  2021 WL 1893074 (N.D. Cal. May 11, 2021) ..........................................................34

*Mallory v. Norfolk S. Ry. Co.*,
  600 U.S. 122 (2023)...................................................................................................9

*In re McCormick & Co. Mktg. & Sales Pracs. Litig.*,
  215 F. Supp. 3d 51 (D.D.C. 2016).....................................................................27, 28

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025)................................................................................14

*Miller v. Saxbe*,
  396 F. Supp. 1260 (D.D.C. 1975).............................................................................21

*Mizokami Bros. of Ariz., Inc. v. Mobay Chem. Corp.*,
  660 F.2d 712 (8th Cir. 1981) .............................................................................17, 18

*Moretti v. Hertz Corp.*,
  2014 WL 1410432 (N.D. Cal. Apr. 11, 2014) ..........................................................11

iii

*Moses v. Howard Univ. Hosp.*,
   606 F.3d 789 (D.C. Cir. 2010) ...................................................................................24, 25

*Municipal Revenue Serv. v. Xspand, Inc.*,
   700 F. Supp. 2d 692 (M.D. Pa. 2010) .............................................................................36

*Nat'l Parks Conservation Ass'n v. Semonite*,
   422 F. Supp. 3d 92 (D.D.C. 2019) ...................................................................................25

*Neurotron, Inc. v. American Association of Electrodiagnostic Medicine*,
   189 F. Supp. 2d 271 (D. Md. 2001) ...........................................................................38, 39

*North v. Walsh*,
   881 F.2d 1088 (D.C. Cir. 1989) .................................................................................21, 22

*Otherson v. Dep't of Just.*,
   711 F.2d 267 (D.C. Cir. 1983) .............................................................15, 18, 19, 21, 23

*Paulo v. Holder*,
   669 F.3d 911 (9th Cir. 2011) ...........................................................................................22

*Peak Health Ctr. v. Dorfman*,
   2019 WL 5893188 (N.D. Cal. Nov. 12, 2019) ...............................................................39

*Pyramid Sec. Ltd. v. IB Resol., Inc.*,
   924 F.2d 1114 (D.C. Cir. 1991) ......................................................................................24

*Riley v. Nat'l Fed'n of the Blind*,
   487 U.S. 781 (1988) .........................................................................................................39

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*,
   60 F. Supp. 3d 21 (D.D.C. 2014) ................................................................9, 13, 21, 24

*SCPS, LLC v. Kind Law*,
   770 F. Supp. 3d 11 (D.D.C. 2025) ..................................................................................12

*In re Sealed Case*,
   932 F.3d 915 (D.C. Cir. 2019) ........................................................................................10

*Shah v. Guidehouse, LLP*,
   2022 WL 741866 (D.D.C. Mar. 2, 2022) ........................................................................12

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
   549 U.S. 422 (2007) ...................................................................................................19, 23

*Spence v. TRW, Inc.*,
   92 F.3d 380 (6th Cir. 1996) .............................................................................................22

*Ukiah Adventist Hosp. v. FTC*,
    981 F.2d 543 (D.C. Cir. 1992) ..................................................................................23

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ...........................................................................35, 36

*Univ. Loft Co. v. Avteq, Inc.*,
    2015 WL 13548950 (S.D. Tex. Dec. 22, 2015) .......................................................34

*Water & Sand Int'l Cap., Ltd. v. Capacitive Deionization Tech Sys.*,
    563 F. Supp. 2d 278 (D.D.C. 2008) ........................................................................26

*Wexler v. Dorsey & Whitney, LLP*,
    2019 WL 5485265 (E.D.N.Y. Oct. 25, 2019) ..........................................................43

*Worldwide Network Servs., LLC v. DynCorp Int'l*,
    496 F. Supp. 2d 59 (D.D.C. 2007) ..........................................................................12

*Yamaha Corp. of Am. v. United States*,
    961 F.2d 245 (D.C. Cir. 1992) ................................................................................22

*Yangtze Memory Techs. Co., Ltd. et al. v. Strand Consult et al.*,
    No. 5:24-cv-3454-NW (N.D. Cal. filed June 7, 2024) ..............................................7

*Zaltz v. JDATE*,
    952 F. Supp. 2d 439 (E.D.N.Y. 2013) .....................................................................11

## Statutes

D.C. Code § 13-423(a).........................................................................................14, 24

Lanham Act, 15 U.S.C. § 1125(a) ........................................................................ *passim*

## Other Authorities

13D Wright & Miller, Fed. Prac. & Proc. § 4436 (Rev. 4th ed. 2024)....................................15, 17

Fed. R. Civ. P. 4(k)(2)........................................................................................ *passim*

Fed. R. Civ. P. 12 ..................................................................................................22

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| 1 | Defendants' Opposition to Plaintiffs' Motion to Transfer Action to the U.S. District Court for the District of Columbia, filed at Dkt. 93 in *Yangtze Memory Techs. Co., et al. v. Strand Consult, et al.*, No. 5:24-cv-3454 (N.D. Cal.) |

**INTRODUCTION**

Defendants' motion to dismiss overstates the scope and preclusive effect of prior proceedings in California, seeks to impose novel barriers to establishing standing, and asks this Court to settle contested questions of fact in Defendants' favor now, at the pleading stage, rather than take as true the Complaint's detailed allegations that Defendants knowingly published false claims about YMTC's memory chips and in so doing caused YMTC real harm.  Defendants advance a series of erroneous grounds for dismissal, including that this Court lacks personal jurisdiction over them, that Judge Wise's dismissal of the case in the Northern District of California barred suit here based on preclusion principles, that YMTC has failed to establish standing, and that YMTC has failed to state a claim for relief under the Lanham Act.  The Court should reject each one.

*First*, this Court has personal jurisdiction over the Defendants because Defendants contractually consented to it.  The China Tech Threat Terms of Use—drafted by Strand and imposed on every visitor to the site since 2019—require that any legal action arising from the content of the site be filed exclusively in this District.  The clause is mandatory and exclusive. Defendants do not challenge the validity of their own consent to jurisdiction in this District. They argue only that YMTC's claims fall outside its scope.  Not so.  The Terms define "Services" to include providing users with content, and YMTC's claims arise from false content Defendants published through those Services.  Both Defendants are bound: Strand drafted the Terms and is named as the site's owner; Layton co-founded China Tech Threat, serves as Strand's Executive Vice President, and authored the very content at issue.

Independently, this Court has jurisdiction under the D.C. long-arm statute because the Defendants, through their Terms of Use, centered all legal claims around D.C. law and imposed D.C. courts as the sole forum for disputes arising from the website.

***Second***, the California court's rulings do not preclude this action.  The *forum non conveniens* dismissal ruling held that California was a less convenient forum than Denmark but said nothing about the District of Columbia.  Contractual consent jurisdiction was never before the California court.  Indeed, Defendants withheld their forum selection clause from the California court while arguing that there was no U.S. jurisdiction.  Absent the opportunity to consider Defendants' forum selection clause, Judge Wise qualified her ruling: D.C. would lack jurisdiction "without more" and "absent waiver or other particular circumstances."  The forum selection clause at issue here is both "more" and a "particular circumstance" sufficient to remove the current pleading from the reach of Judge Wise's ruling.  The clause also independently bars Defendants' *forum non conveniens* argument because a party who agreed to litigate here waives the right to call this forum inconvenient.

Defendants' reliance on the denial of transfer to this District fares no better.  That ruling assessed only Rule 4(k)(2) minimum contacts and was not a final judgment—only the *forum non conveniens* dismissal produced the judgment, and the jurisdictional finding was not necessary to it.  Contractual consent and minimum contacts are different doctrines; courts in this District have rejected one and upheld the other on the same motion, in the same case.  A ruling on minimum contacts does not bar a different jurisdictional doctrine the court never considered.

Judicial estoppel also fails as a basis for dismissal: YMTC's contract-based issue is not inconsistent with its earlier Rule 4(k)(2) argument because the two rest on different legal bases; YMTC did not prevail in California—it lost; and any unfairness runs against Defendants, who chose this forum by contract and then told the California court that no U.S. jurisdiction existed while failing to disclose their own choice.

2

*Third*, YMTC has both Article III and statutory Lanham Act standing. YMTC alleges a specific lost contract worth hundreds of millions of dollars, damaged relationships with U.S. technology customers, and harm to YMTC's commercial reputation. The causal chain is clear: Micron paid Defendants to publish false reports; those reports targeted YMTC's customers by name and urged them to buy from Micron; and shortly after the reports intensified, YMTC's largest pending deal collapsed. Defendants' effort to blame government publications or political pressure raises fact disputes that should not be resolved at the pleading stage.

*Fourth*, the Complaint states a Lanham Act claim. The challenged statements are commercial speech—paid for by a direct competitor, directed at purchasing decisions, and published to divert customers from YMTC to Micron. And they are false. Not arguably false or misleading by implication. False as in impossible based on constraints imposed by the laws of physics. The Lanham Act exists for cases like this, in which a competitor paid agents to spread false claims about a rival's products to steal its customers.

Accordingly, and for the reasons discussed below, this Court should deny the motion and allow the case to proceed.

## ALLEGATIONS OF THE COMPLAINT

### A. Micron Funds a Disinformation Campaign Against YMTC, Using Defendants as Its Instruments.

YMTC develops and manufactures advanced 3D NAND flash memory chips. Compl. ¶ 20. Its wholly owned U.S. subsidiary manages YMTC's U.S. commercial relationships. *Id.* ¶ 21. YMTC competes against Micron Technology, Inc. in the 3D NAND flash memory market. *Id.* ¶¶ 3-5, 20-21, 37-38.

By 2022, industry analysts described YMTC as having "leap-frogged Micron" to become "the leader in 3D NAND flash," predicting that YMTC would be "the uncontested Flash

technology leader." Compl. ¶¶ 3, 37. Micron's CFO acknowledged that YMTC had "made progress" and secured "engagements with customers," which he called a "concern for the NAND space." *Id.* ¶ 57. Rather than respond through innovation, Micron funded a disinformation campaign to damage YMTC commercially and divert its customers to Micron. *Id.* ¶¶ 4, 38-39.

Micron ran the campaign through Defendant Strand Consult ApS, a Danish consulting firm that runs a website called "China Tech Threat," and Defendant Roslyn Layton, Strand's Executive Vice President and co-founder of the website. Compl. ¶¶ 4, 22-23. Neither Strand nor Layton has any genuine connection to U.S. public policy; as they admitted, they took part purely for commercial reasons. *Id.* ¶¶ 5, 9.

DCI Group AZ, L.L.C. ("DCI"), a Washington, D.C. public affairs firm with a history of "astroturfing"—disguising commercial messaging as independent advocacy—directed and wrote content for China Tech Threat while hiding that it took part. Compl. ¶¶ 6, 10, 17, 42-43, 49. Layton published DCI's content under her own name. *Id.* ¶ 42. Defendants hid DCI's role for a reason: The campaign "would have been discredited as biased, anti-competitive attacks if transparently attributed to Micron." *Id.* ¶ 4. By routing messages through China Tech Threat, Micron made commercially motivated attacks look like independent research. *Id.* ¶¶ 39, 46.

John Strand, Strand's CEO and founder, admitted in an interview that "on the content on China Tech Threat, we have made money." Compl. ¶ 9. He declined to say whether DCI paid him, Layton, or Strand Consult directly. *Id.* On information and belief, Micron and DCI paid Strand, Layton, and their associated entities to spread messages favorable to Micron and damaging to YMTC. *Id.* ¶¶ 9, 41; *see also id.*, Ex. 1 (Bloomberg article, which is incorporated by reference). The campaign extended beyond YMTC: China Tech Threat similarly targeted

Lenovo at Dell's behest, falsely claiming that Lenovo's sponsorship of a video game tournament at a U.S. Navy base was "infiltration" of military facilities.  *Id.* ¶ 10.

    **B.**        **Defendants Publish False Statements They Knew Were Impossible.**

Strand and Layton published false statements about YMTC and its products on China Tech Threat from September 2020 through 2022.  Compl. ¶¶ 11, 50-55.  They claimed, without citation, that "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft and cyber extortion."  *Id.* ¶¶ 11, 51, 68(a).  They dedicated a section on the website to the false claim that YMTC's chips posed an active espionage threat, titled "China's Army to Infiltrate iPhones with YMTC Chips."  *Id.* ¶¶ 11, 51.

The centerpiece of the campaign was a June 2022 report titled "Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker YMTC Threatens National Security" (the "CTT Report").  Compl. ¶ 52, Ex. 4.  Strand and Layton each controlled the CTT Report's content.  *Id.* ¶ 52.  The CTT Report claimed that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing."  *Id.* ¶¶ 52, 68(b), Ex. 4 at 11.  It claimed that "built-in and concealed vulnerabilities" in YMTC chips could be "exploited months or years later to disrupt performance or exfiltrate data."  *Id.* ¶¶ 52, 68(d), Ex. 4 at 10.  And under the heading "Risk #1: National Security—The Battlefield Control Switch," it claimed that YMTC chips could be programmed with a "kill switch" operable by "an unauthorized Chinese government actor."  *Id.* ¶¶ 52, 68(e), Ex. 4.  The sole citation to support that claim was a work of fiction titled *Ghost Fleet: A Novel of the Next World War*.  *Id.* ¶ 52.

Each claim is technically impossible.  YMTC's chips are memory devices that store data.  Compl. ¶¶ 7, 14, 53.  They do not execute code.  *Id.*  They lack the antennas, modems, processors, and other components needed to transmit data wirelessly, accept remote commands, or send information to third parties.  *Id.* ¶ 14.  Strand and Layton knew that.  Strand holds itself

5

out as a telecommunications technology authority with 25 years of experience, and Layton claims expertise in "telecom network innovation" and "network security." *Id.* ¶¶ 22, 54. With that claimed expertise, Strand and Layton showed at minimum reckless disregard for the truth when they published these assertions without citing any legitimate source. *Id.* ¶¶ 54-55.

The commercial purpose of the campaign was plain on the face of the CTT Report. The Report named "Idaho-based Micron" as "the only American company" in the relevant market and urged Apple to "source its chips from existing suppliers like Micron" rather than continue its relationship with YMTC. Compl. ¶¶ 12, 58, Ex. 4 at 4, 8, 14. It aired Micron-specific grievances, accusing a Chinese chipmaker of hiring away "Micron engineers" to steal Micron trade secrets, while making no comparable allegations about any other company. *Id.* ¶ 13. The Report mentions YMTC 145 times in 16 pages. *Id.* Ex. 4. Defendants aimed these commercial solicitations at YMTC's existing and prospective customers, not policy positions. *Id.* ¶¶ 56, 59.

From 2020 through 2022, DCI secretly created content for Strand and Layton to publish as if they had written it themselves. Compl. ¶ 42. A press release, that listed Layton as author, falsely claimed that YMTC had ties to the Chinese military, when DCI employees had in fact written it. *Id.* NOTUS, the non-partisan, non-profit news organization, later uncovered metadata in China Tech Threat documents confirming that DCI employees wrote materials that bore China Tech Threat's name. *Id.* ¶¶ 43-45. When that reporting became public, Strand and Layton removed the documents and replaced them with versions that stripped the metadata identifying DCI. *Id.* ¶¶ 43, 48.

The campaign harmed YMTC. After Strand and Layton stepped up their attacks on YMTC's relationship with a leading OEM customer in mid-2022, by October 2022 that customer suspended and later abandoned its plans to source chips from YMTC. Compl. ¶ 62. YMTC had

6

qualified with the OEM, stood ready to supply advanced 3D NAND flash memory chips for flagship products, and offered prices about 20% below competitors; the lost opportunity alone accounted for hundreds of millions of dollars in revenue. *Id.* YMTC also lost sales, business opportunities, and customer relationships across the U.S. technology sector because of China Tech Threat's false narrative. *Id.* ¶¶ 61-63.

       **C.**       <u>**YMTC Sues in California; Defendants Tell the Court That D.C. Lacks Jurisdiction Over Them While Their Terms of Use Provide Otherwise.**</u>

YMTC sued Strand and Layton in the Northern District of California on June 7, 2024. Compl. ¶ 29; *Yangtze Memory Techs. Co., Ltd. et al. v. Strand Consult et al.*, No. 5:24-cv-3454-NW (N.D. Cal. filed June 7, 2024). On November 17, 2024, YMTC filed an Amended Complaint invoking Federal Rule of Civil Procedure 4(k)(2) and adding DCI as a defendant. *See* Cal. Action, Dkt. 50.

Strand and Layton moved to dismiss on several grounds, some of which they raise again here. But they did not challenge personal jurisdiction. Cal. Action, Dkt. 65. Yet the California court found that YMTC had not shown personal jurisdiction over Strand and Layton and gave leave to amend. *Id.*, Dkt. 81. YMTC moved for reconsideration, arguing that Strand and Layton had waived any personal jurisdiction defense by not raising it. *Id.*, Dkt. 88.

While reconsideration was pending, YMTC moved to transfer the action to this District and to consolidate it with the related D.C. Action against DCI and Micron. Strand and Layton moved to dismiss on *forum non conveniens* grounds, arguing that Denmark was the more appropriate forum. Cal. Action, Dkts. 91, 92. All three motions were pending at the same time. The parties briefed jurisdiction under Rule 4(k)(2) only. *Id.*, Dkts. 91, 93, 94. Neither party raised the forum selection clause in the Terms of Use, and the court never considered it. Strand and Layton opposed YMTC's motion to transfer, argued on the merits that D.C. could not

exercise personal jurisdiction over them, and urged Judge Wise to find that "Defendants do not have minimum contacts with the United States." *Id.*, Dkt. 93 (Defendants' Opposition to Plaintiffs' Motion to Transfer, a true and correct copy of which is attach as **Exhibit 1**) at 7-10.

The California court resolved all three motions in a single order on September 12, 2025 (the "September 2025 Order").  Mot. Ex. A (Cal. Action, Dkt. 99).  On reconsideration, the court found that Strand and Layton had "waived personal jurisdiction [in California] by failing to raise the issue in their motion to dismiss." *Id.* at 4.  On transfer, the court denied YMTC's motion but qualified its ruling: "The Court finds that this case could not have been brought in the District of Columbia, because, ***without more***, the District of Columbia would not have personal jurisdiction over Defendants for this particular dispute (***absent waiver or other particular circumstances***)." *Id.* at 8 (emphasis added).  The court confined its analysis to the Rule 4(k)(2) minimum contacts framework—the only jurisdictional basis before it.  The court did not address contractual consent jurisdiction, the D.C. long-arm statute, or the forum selection clause.  On *forum non conveniens*, the court dismissed the action, finding Denmark an adequate alternate forum.  *Id.* at 13.

After the ruling, Strand and Layton asked Judge Wise to restrict YMTC to refiling only in Denmark.  Cal. Action, Dkt. 102-1 at 2.  YMTC objected that such language would "convert the procedural finding that Denmark is an *adequate* alternative forum into a substantive ruling that Denmark is the *mandatory* forum for any future litigation." *Id.*, Dkt. 104 at 2.  Judge Wise agreed.  The final judgment, which Judge Wise entered on October 2, 2025, states only that "the action is DISMISSED as to all Defendants," without restricting where YMTC may refile.  Mot. Ex. B (Cal. Action, Dkt. 105 at 1).

**D.     <u>YMTC Discovers the Forum Selection Clause and Files in This District.</u>**

After the September 2025 Order, YMTC discovered that Strand had drafted Terms of Use for the China Tech Threat website with a mandatory forum selection clause designating D.C. as

8

the exclusive forum.  Compl. ¶ 25, Ex. 5.  The Terms condition access to China Tech Threat on accepting those term before accessing the site and form a binding agreement between Strand and all users.  *Id.*  Ex. 5 at 3.  The Terms define "Services" as "provid[ing] you with content," and Sections 1 through 4 define "Content," assign ownership, and set rules for its use.  *Id.* at 3-4. Section 13, in effect since April 2019, contains the forum selection clause:

> Any legal action, suit or proceeding arising out of or relating to these Terms of Use, or Your use of the Site or the Services must be instituted exclusively in the federal or state courts located in the District of Columbia and in no other jurisdiction. You further consent to exclusive personal jurisdiction and venue in, and agree to service of process issued or authorized by, any such court.

Compl. Ex. 5 at 6.

YMTC filed this action on October 3, 2025, invoking Strand and Layton's consent to jurisdiction in this District in the forum selection clause, as well as the D.C. long-arm statute. Compl. ¶¶ 25-27.  A related action against Micron and DCI is pending in this Court.  *Id.* ¶ 30.

## ARGUMENT

### I.    THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS.

#### A.    Defendants Consented to Personal Jurisdiction in the Forum Selection Clause.

This Court has personal jurisdiction because Defendants agreed to it by contract.  A court may exercise jurisdiction over a nonresident defendant who gives "express or implied consent." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 137-38 (2023).  A forum selection clause is one form of consent; when one governs, it "bestow[s] jurisdiction through contract principles rather than through minimum contacts."  *M3 USA Corp. v. Qamoum*, 2021 WL 2324753, at *8 (D.D.C. June 7, 2021) (citing *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 60 F. Supp. 3d 21, 32 (D.D.C. 2014)).

9

Defendants do not dispute that China Tech Threat's Terms of Use contain a D.C. forum selection clause, or that the clause is valid, enforceable, and mandatory. Mot. 23-24. They raise only two objections: The clause does not cover YMTC's Lanham Act claim (Mot. 23), and it does not bind Layton (Mot. 24). Both arguments fail.

### 1. The Forum Selection Clause Covers This Dispute.

YMTC's Lanham Act claim falls within the clause. A forum selection clause applies if "its scope" covers "the dispute" under "normal principles of contract interpretation." *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874 (D.C. Cir. 2019).

*First*, Defendants' forum selection clause covers "[a]ny legal action, suit or proceeding arising out of or relating to these Terms of Use, or Your use of the Site or the Services." Compl. Ex. 5 at 6. D.C. Circuit caselaw reads "relating to" broadly: the phrase means "to have [a] relationship or connection" and requires only "some 'logical or causal connection'" to the agreement—a logical connection alone suffices. *In re Sealed Case*, 932 F.3d 915, 928-29 (D.C. Cir. 2019) (construing statute); *Azima*, 926 F.3d at 876-78 (construing contract). Thus, the claim here relates to the Terms because it targets Content delivered through the Services the Terms define. The Terms define "Services" as "provid[ing] you with content," and Sections 1 through 4 define "Content," assign ownership, and set rules for its use. Compl. Ex. 5 at 3-4. YMTC's claim challenges the CTT Report and CTT Blog Post—Content which Strand published through the Site and delivered to users as part of the Services. Compl. ¶¶ 51-52, 68 & Ex. 5 at 3. A claim targeting Content delivered through the Services has a "logical or causal connection" to the agreement that defines both. *Azima*, 926 F.3d at 877.

The D.C. Circuit in *Azima* enforced a forum selection clause against tort claims for hacking, conversion, and unfair competition—none with a contractual basis—because the hack bore a logical connection to a negotiation referenced in the agreement's preamble which played a

role in the agreement's formation.  926 F.3d at 873, 876-79.  The connection here is even tighter: the Terms define Content and Services, and YMTC's claim targets Content delivered through the Services.  Compl. ¶¶ 51-52, 68 & Ex. 5 at 3.  Defendants chose "relating to" and cannot now narrow it.  *Azima*, 926 F.3d at 878 ("[I]f the parties had wished to mark a narrower boundary for th[e] forum-selection clause, they could have easily done so").

*Second*, the claim relates to YMTC's "use of the Site or the Services."  Compl. Ex. 5 at 6.  YMTC accessed the China Tech Threat website and encountered the CTT Report and CTT Blog Post—Content the Services delivered.  Compl. ¶¶ 45, 48, 51-52, 68; Compl. Exs. 3-5.  The clause does not require that YMTC's injury flow from browsing—only that this legal action "relat[e] to" that use.  *Azima*, 926 F.3d at 878; *cf. Beall v. Edwards Lifesciences LLC*, 310 F. Supp. 3d 97, 101-02 (D.D.C. 2018) (tort claims fell outside of the scope of forum selection clause in employment contract only where the clause "contained [no] broader language requiring that any dispute 'related to' or 'arising out of' the employment agreement").  YMTC's encounter with false Content through the Services provides that factual connection.  Other courts agree. *See Kabbash v. Jewelry Channel, Inc. USA*, 2016 WL 9132930, at *5 (N.D. Cal. Feb. 22, 2016) (collecting cases where "a customer's use of defendant's web site was sufficient to implicate the forum selection clause as to the customer's tort claims" and holding the forum selection clause in the Terms of Use indeed applied to the tort claims); *Moretti v. Hertz Corp.*, 2014 WL 1410432, at *3 (N.D. Cal. Apr. 11, 2014) (false advertising claims fell within the clause where the plaintiff got a car rental through a provider "advertised on [the] website"); *Zaltz v. JDATE*, , 952 F. Supp. 2d 439, 454-55 (E.D.N.Y. 2013) (claims "subject to the [forum selection] clause because the clause governs 'any and all claims by user arising out of or related to the Websites'").

11

Defendants' "no breach" argument is untenable.  Defendants say that YMTC "has not alleged breach of the Terms of Use or of any agreement between YMTC and Defendants (nor could it)."  Mot. 24.  A plaintiff need not allege breach—courts look at "the substance of the claims shorn of their labels," not the cause of action.  *Shah v. Guidehouse, LLP*, 2022 WL 741866, at \*2 (D.D.C. Mar. 2, 2022).  Stripped of its label, YMTC's claim targets false statements Defendants published as Content through the Site that the Terms govern.  Compl. ¶¶ 51-52, 68, Ex. 5 at 3.  Defendants themselves drafted the Terms, defined "Services" to include delivery of digital content, and chose to have the Terms encompass all claims "arising out of or relating to" the Services.  *Id.* Ex. 5 at 3, 6.  They should not be allowed to shut out a tort claim by hiding behind a no-breach argument, "counter to the law favoring forum selection clauses."  *Worldwide Network Servs., LLC v. DynCorp Int'l*, 496 F. Supp. 2d 59, 63 (D.D.C. 2007) (citation omitted).

Defendants' reliance on *SCPS, LLC v. Kind Law*, 770 F. Supp. 3d 11 (D.D.C. 2025), fails because that case involved a different kind of clause, a different agreement, and different defendants.  Mot. 23-24.  The clause in *SCPS* was an arbitration clause, which creates only "narrow" implied consent limited to "actions seeking to compel arbitration," and the plaintiffs there invoked one agreement to block arbitrations under a different agreement—a mismatch the court found fatal.  770 F. Supp. 3d at 33-36.  Unlike the clause in *SCPS*, the clause here is a litigation forum selection clause in which users "consent to exclusive personal jurisdiction and venue in" D.C. courts.  Compl. Ex. 5 at 6.  YMTC invokes the same Terms that contain the clause and sues about Content Defendants published through the Site and Services those Terms govern.  Compl. ¶¶ 51-52, 68.  And unlike the defendants in *SCPS* who were third-party law firms whose conduct the court found was not "closely related" to the agreement or the clause,

12

770 F. Supp. 3d at 41, Strand drafted the Terms, owns the website, and published the Content at issue. Compl. ¶¶ 23, 26, 42.

### 2.    Layton Is Bound by the Forum Selection Clause.

Layton is bound by the forum selection clause. A non-signatory may be bound if their conduct is "so closely related to the contractual relationship" that it was foreseeable they would be bound. *Sabre Int'l*, 60 F. Supp. 3d at 33-34 (binding non-signatory corporate officers); *Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 49 (D.D.C. 2005) (binding non-parties to forum selection clause in franchise agreement). The test does not require that the non-signatory be a third-party beneficiary—the question is whether the non-signatory's conduct was such that they should reasonably have anticipated being bound. *Sabre Int'l*, 60 F. Supp. 3d at 35-36.

In *Sabre*, the court bound four corporate officers who helped prepare task-order proposals and met with the plaintiff's staff. *Id*. at 36. Those officers did not create the platform at issue or hold themselves out as its public face—they worked on discrete tasks under an existing contract. *Id.* at 34-36. Layton's ties to China Tech Threat are far closer. Layton co-founded the website and serves as Executive Vice President of the entity that owns and runs it. Compl. ¶¶ 23, 26. China Tech Threat publications list her as the author, including a press release that DCI employees wrote. *Id.* ¶ 42. China Tech Threat correspondence lists her contact address. *Id.* ¶ 23. And she published the content through the China Tech Threat website—the Site the Terms govern. *Id.* ¶ 26. Layton built the platform, published the content at the center of this dispute, and held herself out as its public face. Her conduct is "closely related to the contractual relationship" the Terms create, and it was "foreseeable that [she] would be bound." *Sabre*, 60 F. Supp. 3d at 34-35.

13

**B.**      **This Court Also Has Personal Jurisdiction Under the Long-Arm Statute.**

The D.C. long-arm statute independently reaches Defendants.  The statute covers any person who "transact[s] any business in the District of Columbia."  D.C. Code § 13-423(a)(1).  "[A] single act may be sufficient to constitute transacting business … so long as that contact is voluntary and deliberate, rather than fortuitous."  *Media Matters for Am. v. Paxton*, 138 F.4th 563, 576 (D.C. Cir. 2025).  "[N]egotiating, performing, or soliciting business contracts within the District … qualif[ies]."  *Abramson v. Wallace*, 706 F. Supp. 1, 2 (D.D.C. 1989) (exercising jurisdiction where the plaintiff alleged that the parties negotiated a contract in D.C. and partly performed it at a D.C. facility).  More broadly, jurisdiction may exist where a defendant "enter[s] a contractual relationship centered [in the forum]."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021).

Defendants' Terms of Use entered just that kind of relationship.  Defendants adopted the Terms, imposed them on every user of the Site, selected D.C. law, and designated D.C. courts as the sole forum for disputes arising from the website.  Compl. Ex. 5.  That anchored their operations in this District—the opposite of a "random, isolated, or fortuitous" contact.  *Ford Motor Co.*, 592 U.S. at 359.  YMTC's claims arise directly from that relationship and the same logic also applies to D.C. Code § 13-423(a)(4), which reaches defendants who cause tortious injury in D.C. through conduct outside D.C. while engaging in a "persistent course of conduct" here.  Defendants maintained these Terms of Use since 2019.

Defendants' passive-website cases do not help them.  *See* Mot. 25 (citing *Hayes v. FM Broad. Station WETT*, 930 F. Supp. 2d 145 (D.D.C. 2013), and *Brightwell Dispensers Ltd. v. Dongguan ISCE Sanitary Ware Indus. Co.*, 2019 WL 7037493 (D.D.C. Dec. 20, 2019)).  In those cases, the defendants had no link to D.C. beyond a website that happened to be accessible here.

14

Defendants did not merely run a website accessible in D.C.  They deliberately acted to make a "contractual relationship centered [in the forum]." *Ford Motor Co.*, 592 U.S. at 359.

## II.   THE RULINGS IN THE PRIOR ACTION DO NOT PRECLUDE THIS ACTION.

### A.   Neither the Prior *Forum Non Conveniens* Dismissal Nor Any Independent Determination Requires Dismissal.

Judge Wise's dismissal has no preclusive effect, and *forum non conveniens* does not independently require dismissal.  The forum selection clause here refutes Defendants' arguments that preclusion applies because YMTC "has alleged no new material facts or law" (Mot. 12) and that dismissal is warranted regardless because "the forum non conveniens factors are nearly identical between the Ninth and D.C. Circuits" (Mot. 13).

### 1.   Preclusion Does Not Apply to the *Forum Non Conveniens* Dismissal.

Defendants cannot establish that Judge Wise's prior dismissal precludes this action without showing, among other things, that: (1) the same issue now being raised was litigated before Judge Wise, and (2) the issue was "actually and necessarily determined." *Otherson v. Dep't of Just.*, 711 F.2d 267, 273 (D.C. Cir. 1983).  Defendants satisfy neither element.

**The Issues Are Not the Same.**  Preclusion applies only where "the issue actually remains the same."  13D Wright & Miller, Fed. Prac. & Proc. § 4436 (Rev. 4th ed. 2024).  That means "the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." *Aenergy, S.A. v. Republic of Angola* (*Aenergy IV*), 123 F.4th 1351, 1356 (D.C. Cir. 2024) (quoting 13C Wright & Miller § 4425).  The issues here differ for two independent reasons: the forum selection clause triggers a different legal standard, and the *forum non conveniens* analysis is inherently forum-specific—yet no court assessed the factors specific to this District.

15

*First*, the forum selection clause changes the governing legal standard. Without a forum selection clause, a court applies the standard set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947): it "must evaluate both the convenience of the parties and various public-interest considerations." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). The standard adapts, however, when the parties' contract contains a valid forum-selection clause. *Id.* at 63. Under the *Atlantic Marine* standard, the clause gets "controlling weight in all but the most exceptional cases." *Id.* The court must disregard "the parties' private interests" entirely, and the party resisting the clause bears the burden of showing that "public-interest factors overwhelmingly disfavor" the contractual forum. *Id.* at 64, 67.

Judge Wise applied the *Gulf Oil* standard because no party raised a forum selection clause. Mot. Ex. A at 9. Judge Wise placed the burden on Defendants to show that "the balance of private and public interest factors favors dismissal," and weighed private-interest factors— "the residence of the parties and the witnesses," "the forum's convenience to the litigants," and "access to physical evidence and other sources of proof." *Id.* at 9, 11-12. The *Atlantic Marine* standard requires the opposite: disregard private-interest factors and place the burden on the party resisting the clause to show "extraordinary circumstances." *Atl. Marine*, 571 U.S. at 62, 64. Different standards produce different issues. *Aenergy IV*, 123 F.4th at 1356 (requiring "the same general legal rules" to "govern both cases"). Defendants failed to address the *Atlantic Marine* standard in their preclusion argument. Mot. 21-26.

Defendants' main authority confirms rather than undermines this conclusion. No valid forum selection clause existed in *Aenergy*, so the *Atlantic Marine* standard never applied. *Aenergy, S.A. v. Republic of Angola* (*Aenergy III*), 678 F. Supp. 3d 147, 164 n.3 (D.D.C. 2023). There, the plaintiff sued for breach of contract in the Southern District of New York; that court

16

dismissed under the *Gulf Oil* standard, and the Second Circuit affirmed. *See id.* at 158. The plaintiff refiled in this District. This Court and the D.C. Circuit held that preclusion barred relitigation because both actions applied the same standard—the *Gulf Oil* standard—to the same facts. *Id.* at 158, 161-62, 164; *Aenergy IV*, 123 F.4th at 1353-54. None of those courts applied the *Atlantic Marine* standard or addressed how the different standard affected the preclusion analysis. That is the question here, and *Aenergy* does not answer it.[1]

**Second**, even apart from the *Atlantic Marine* standard, *forum non conveniens* rulings do not ordinarily preclude relitigation in other courts because the convenience calculus changes from forum to forum. *See* 13D Wright & Miller § 4436 (explaining that such rulings "ordinarily [] cannot work issue preclusion as to other courts because the convenience issues are intrinsically different"). A dismissal in one district resolves only whether *that* forum is convenient—it does not bar relitigation in a different district where the convenience factors differ. *Mizokami Bros. of Ariz., Inc. v. Mobay Chem. Corp.*, 660 F.2d 712, 716-17 (8th Cir. 1981) (holding that a *forum non conveniens* dismissal in Arizona was "conclusive [] only as to … an Arizona forum").

In *Mizokami*, a pepper importer sued an insecticide manufacturer in the District of Arizona; the court dismissed for *forum non conveniens*, finding Mexico more convenient

---

[1]  Each of the D.C. Circuit's three reasons for finding preclusion in *Aenergy* reinforces the distinction. *Aenergy IV*, 123 F.4th at 1357-58. The court found adequacy unchanged because "dropping some claims" did not matter when eight remained. *Id.* at 1357. YMTC does not drop claims—YMTC invokes a forum selection clause that makes this District the presumptive forum, replacing the *Gulf Oil* inquiry with the *Atlantic Marine* presumption that the contractual forum controls. *Atl. Marine*, 571 U.S. at 62-63. The court found the interest factors unchanged because the complaint "still pertains to Angolan contracts governed by Angolan law" with Portuguese-language documents and Portuguese-speaking witnesses. *Aenergy IV*, 123 F.4th at 1358. This case involves a U.S. federal statute, English-language publications, and a clause that eliminates private-interest factors altogether. *Atl. Marine*, 571 U.S. at 64. The court found the party lineup unchanged because the plaintiff dropped the U.S.-based GE defendants, making Angola "a fortiori … the more convenient forum." *Aenergy IV*, 123 F.4th at 1358. YMTC has not weakened its case for a U.S. forum—YMTC has strengthened it by invoking a clause that gives this District "controlling weight." *Atl. Marine*, 571 U.S. at 63.

17

because the relevant events—growing, pesticide application, distribution—occurred there. *Id.* at 714, 717-18. After the Ninth Circuit affirmed, the importer refiled in the Western District of Missouri, where the manufacturer operated its plant and distributed the insecticide. *Id.* at 715. The manufacturer argued that the Arizona dismissal precluded the Missouri suit. *Id.* at 716. The Eighth Circuit disagreed because no court had explored the Missouri-specific convenience factors—"the contacts of the parties and transactions with Missouri, the availability of witnesses and evidence in Missouri, and factors affecting the burden on the Missouri District Court." *Id.* The dismissal in Arizona was "conclusive … only as to the availability of an Arizona forum." *Id.* at 717.

This case mirrors *Mizokami*. YMTC filed in California; Judge Wise dismissed, finding Denmark more convenient. Mot. Ex. A at 9-13. YMTC refiled here. Compl. ¶ 29. As in *Mizokami*, the first court never evaluated the convenience factors specific to this forum. Judge Wise's domestic-plaintiff analysis turned on YMTC-USA's status as "a California corporation with its principal place of business in Santa Clara." Mot. Ex. A at 2. Judge Wise assessed proof and witness access in the context of a California case. *Id.* at 11-12. Judge Wise never addressed this District and never weighed that a related action against Micron and DCI Group is pending before this Court. *Id.* at 9-13. To be sure, some of Judge Wise's findings—that Defendants live in Denmark, that evidence is there, that travel to the U.S. would be burdensome—apply to any U.S. court. *Id.* at 11-12. But those are private-interest factors, and the forum selection clause removes them from the analysis. *Atl. Marine*, 571 U.S. at 64.

**The "Issue" Was Not Actually Determined.** Even if the issues were the same, Defendants cannot show that the issue was "actually and necessarily determined." *Otherson*, 711 F.2d at 273. A *forum non conveniens* dismissal is merely "a determination that the merits

18

should be adjudicated elsewhere;" it resolves that the chosen forum is inconvenient, not where the plaintiff must go instead. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007). Judge Wise decided only that California was not the right forum.

The final judgment confirms this. Defendants proposed judgment language stating the dismissal was "without prejudice to refiling in Denmark." Cal. Action, Dkt. 102-1 at 2. YMTC objected that this language would convert a procedural finding into a substantive restriction on future litigation. *Id.*, Dkt. 104 at 2. Judge Wise agreed with YMTC: the final judgment states only that "the action is DISMISSED as to all Defendants," with no geographic restriction. Mot. Ex. B at 1. Defendants asked Judge Wise to limit refiling to Denmark, and Judge Wise declined. Because Judge Wise never decided where YMTC must refile, that question was not "actually and necessarily determined." *Otherson*, 711 F.2d at 273. YMTC refiled in Defendants' chosen forum. Compl. ¶ 25, Ex. 5 at 6

### 2.      *Forum Non Conveniens* Does Not Independently Require Dismissal.

Defendants argue that even without preclusion, *forum non conveniens* requires dismissal "because the material facts are the same and the *forum non conveniens* factors are nearly identical between the Ninth and D.C. Circuits." Mot. 13. That argument ignores the forum selection clause. As explained above (*see* § II.A.1), the clause triggers the *Atlantic Marine* standard: This District gets controlling weight, private-interest factors drop out, and Defendants bear the burden of showing that "public-interest factors overwhelmingly disfavor" this forum. 571 U.S. at 63-64, 67. Defendants cannot carry that burden.

Defendants' private-interest arguments fail. By agreeing to the forum selection clause, they "waive[d] the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64. Whatever inconvenience they now assert "was clearly foreseeable at the time of contracting." *Id.* (citation

19

omitted).  Defendants ask the Court to credit arguments about witness location, evidence location, and travel burden.  Mot. 14 (citing Ex. A at 11-12).  But each is a private-interest factor that *Atlantic Marine* bars.  571 U.S. at 64; *see ATB Marine, Inc. v. AES Puerto Rico, L.P.*, 2025 WL 1191104, at *6-7 (D. Del. Apr. 24, 2025) (denying transfer from contractually designated forum where defendant "improperly focuses on private interest factors").  Defendants' claim that YMTC is a "stranger to the forum" entitled to "little deference" (Mot. 14) misses the point. *Atlantic Marine* gives the plaintiff's choice of forum "no weight" regardless—so the degree of deference does not matter.  571 U.S. at 63.

That leaves public-interest factors.  Defendants must show that they "overwhelmingly disfavor" this District.  *Id.* at 67.  They cannot meet that burden.  This case raises a federal Lanham Act claim arising from a campaign of false statements targeting companies in the U.S. memory-device market.  Compl. ¶¶ 48-50, 64-76.  This District has a strong interest in the dispute.  The campaign injured YMTC's U.S. business relationships.  *Id.* ¶¶ 48-50, 60-63. Defendants structured their campaign through DCI Group, a D.C.-based firm.  *Id.* ¶ 22.  A related action against Micron and DCI Group is pending before this Court; consolidating related cases serves judicial economy and avoids inconsistent results.  *Id.* ¶ 30.  Denmark does not have a stronger interest in a false-advertising claim arising under U.S. law, targeting U.S. commercial relationships, and causing injury in the U.S. market.  No public-interest factor overwhelmingly disfavors this District.  The forum selection clause controls.  *Atl. Marine*, 571 U.S. at 63, 67.

## B.      Judge Wise's Transfer Denial Does Not Preclude YMTC's Jurisdictional Allegations Here.

Defendants argue that Judge Wise's transfer denial independently precludes YMTC from asserting personal jurisdiction here on any ground.  Mot. 15-21.  Defendants face the same *Otherson* standard as discussed above (*see* § II.A.1), and they satisfy neither element.

20

### 1.    The "Same Issue" Element Fails Because Contractual Consent and Minimum Contacts Rest on Different Legal Standards.

The same principle that defeats preclusion on the *forum non conveniens* ruling defeats it here.  "Issues are not identical if the second action involves application of a different legal standard." *North v. Walsh*, 881 F.2d 1088, 1096 (D.C. Cir. 1989); *see also Jackson v. Off. of the Mayor of D.C.*, 911 F.3d 1167, 1171 (D.C. Cir. 2018) (holding that state-court and federal-court jurisdictional dismissals raised "different issues").  Judge Wise analyzed only whether Defendants had minimum contacts with the United States under Rule 4(k)(2).  Mot. Ex. A at 5-8. YMTC's contractual-consent theory rests on a different legal standard.  A forum selection clause is an agreement "to settle disputes in a particular forum"; it is not a forum "contact" governed by the minimum-contacts framework.  *Sabre Int'l*, 60 F. Supp. 3d at 32.

Judge Wise's own language confirms this.  Judge Wise found that D.C. "would not have personal jurisdiction over Defendants for this particular dispute" "without more" and "absent waiver or other particular circumstances."  Mot. Ex. A at 8.  A forum selection clause is exactly the kind of "more" and "other particular circumstances" that Judge Wise reserved.  Defendants omit this language when quoting the order.  Mot. 5.  A jurisdictional dismissal is only conclusive "on the jurisdictional issues actually decided … and without prejudice to a subsequent action raising the same or similar underlying facts if different grounds for jurisdiction are claimed." *Miller v. Saxbe*, 396 F. Supp. 1260, 1261 (D.D.C. 1975).

No party raised contractual consent before Judge Wise.  *See Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (requiring that the issue be "contested by the parties and submitted for judicial determination").  YMTC argued jurisdiction under Rule 4(k)(2) based on U.S. contacts.  Cal. Action, Dkt. 91 at 14-19.  Defendants argued that YMTC must "demonstrate that Defendants have at least minimum contacts" in the U.S.  Ex. 1 at 8.  Neither

21

party cited the Terms of Use or mentioned the forum selection clause.  Cal. Action, Dkts. 91, 93, 94.  Defendants point out that YMTC's transfer motion stated that Defendants "consented to jurisdiction."  Mot. 15.  That phrase referred to Defendants' failure to raise Rule 4(k)(2) in their Rule 12 motion—a procedural-waiver argument under Rule 12(h)(1), not a contractual-consent argument.  Cal. Action, Dkt. 91 at 14 (citing Dkt. 88 at 10-12).

Defendants frame the "issue" as "whether this Court may exercise personal jurisdiction over Defendants."  Mot. 16.  That framing sweeps in every possible ground for jurisdiction.  The D.C. Circuit rejected that approach in *North*, reversing an issue-preclusion ruling that stretched "the concept 'issue' so that the term becomes virtually synonymous with 'demand for relief.'" 881 F.2d at 1095-96.  YMTC does not press a new argument under the minimum-contacts standard Judge Wise applied.  YMTC invokes a different doctrine—contractual consent through a forum selection clause—governed by contract law, not due-process analysis.  Every case Defendants cite involves a party who raised a new argument under the same standard the first court applied—not a party who, like YMTC here, invoked an entirely different doctrine.[2]

Defendants' "curable defect" argument fares no better.  Mot. 28.  YMTC is not curing a Rule 4(k)(2) defect.  YMTC raises a different doctrine that existed throughout the California litigation but that neither party raised.

---

[2]  *Hall v. Clinton*, 285 F.3d 74, 81 (D.C. Cir. 2002) (same CSRA-displacement standard); *Kremer v. Chem. Constr.*, 456 U.S. 461, 479-80 (1982) (same disparate-treatment standard); *Spence v. TRW, Inc.*, 92 F.3d 380, 382 (6th Cir. 1996) (same age-discrimination standard); *AMA Multimedia, LLC v. Madon*, 2020 WL 5096476, at *4-5 (D. Nev. Aug. 28, 2020) (same minimum-contacts standard); *Yamaha*, 961 F.2d at 255-57 (same customs-classification standard); *Paulo v. Holder*, 669 F.3d 911, 917-18 (9th Cir. 2011) (same immigration-eligibility standard).

### 2.    The "Actually and Necessarily Determined" Element Fails Because the Jurisdictional Finding Was Incidental to the Judgment.

Even if contractual consent presented the same issue, Defendants cannot show that Judge Wise's jurisdictional finding was "actually and necessarily determined." *Otherson*, 711 F.2d at 273. A finding is "necessary or essential only when the final outcome hinges on it." *Bobby v. Bies*, 556 U.S. 825, 835 (2009). Findings that are "incidental, collateral, or immaterial" cannot "preclude future litigation." *Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016).

The outcome did not hinge on the jurisdictional finding. The *forum non conveniens* dismissal produced the final judgment—not the transfer denial. Mot. Ex. B at 1. The September 2025 Order addressed the transfer motion and the *forum non conveniens* motion in separate sections, and the *forum non conveniens* analysis did not depend on, cite, or mention the personal-jurisdiction finding. Mot. Ex. A at 4-13. Had Judge Wise skipped the transfer motion entirely, the outcome would have been the same—a court may dismiss on *forum non conveniens* grounds "without first establishing" jurisdiction. *Sinochem*, 549 U.S. at 432.

The jurisdictional finding was "incidental" and "collateral" to the judgment, not a determination on which the "final outcome" hinged. *Bobby*, 556 U.S. at 834; *Jones*, 835 F.3d at 83. It is "well settled that transfer orders are not "appealable final orders" because they "allow the case to continue, rather than terminating it." *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 546 (D.C. Cir. 1992). Defendants treat the transfer denial as though it produced the final judgment. Mot. 1. It did not.[3]

---

[3] Defendants' effort to extend the transfer denial's preclusive effect to YMTC's D.C. long-arm theory fails for the same reason. The D.C. long-arm statute applies a different standard than Rule 4(k)(2), turning on D.C.-specific conduct—whether the defendant "transact[ed] any business" or caused "tortious injury" in D.C.—that no party put before Judge Wise. D.C. Code § 13-423(a)(1), (4); Compl. ¶ 27. Defendants cite *Hoult v. Hoult*, 157 F.3d 29, 32 (1st Cir. 1998), to argue that Judge Wise's nationwide-contacts finding "implicitly" decided that Defendants also lack D.C.-specific contacts. Mot. 20. But *Hoult* requires that the implicit

### C.    Judicial Estoppel Does Not Bar YMTC's Jurisdictional Allegations.

Judicial estoppel does not apply.  Courts weigh three factors: (1) whether the party's later position is "clearly inconsistent" with an earlier one, (2) whether the party "succeeded in persuading a court to accept" that earlier position, and (3) whether the party would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010).  Defendants fail on each.

***First***, YMTC's positions are not "clearly inconsistent."  *Id.*  As explained above (*see* § II.B.1), contractual consent and minimum contacts rest on different legal standards.  Pressing one in California and the other here is not inconsistent; those are separate legal issues resting on separate standards.  *See Sabre Int'l*, 60 F. Supp. 3d at 32, 36 (rejecting contacts-based jurisdiction yet upholding contractual-consent jurisdiction on the same motion).

***Second***, YMTC did not "succeed in persuading" the California court to accept its earlier position.  *Moses*, 606 F.3d at 798.  Success is a prerequisite; contradictory positions "do not usually create a judicial estoppel unless the party prevailed on the repudiated pleading."  *Pyramid Sec. Ltd. v. IB Resol., Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991).  YMTC did not prevail.  Judge Wise rejected YMTC's Rule 4(k)(2) argument, finding Defendants' contacts "too insignificant."  Mot. Ex. A at 6.

Defendants redefine "success" as the California court's decision to apply Rule 4(k)(2), calling that standard "far more favorable" to YMTC.  Mot. 22.  But *Moses* asks whether the party "succeeded in persuading a court to accept that party's earlier position"—the substantive point, not the legal vehicle.  606 F.3d at 798.  YMTC asked Judge Wise to find jurisdiction based on nationwide contacts.  Cal. Action, Dkt. 91 at 14-19.  Judge Wise said no.  Mot. Ex. A at 6.

---

finding be a necessary component of the decision—and Judge Wise's jurisdictional finding was not necessary to the *forum non conveniens* judgment.

24

Picking which doctrine to brief is litigation strategy, not a "position" a court "accepts" for estoppel purposes. *See Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 125-26 (D.D.C. 2017) (rejecting judicial estoppel where the plaintiff "did not prevail in its [earlier] argument that District of Columbia law applied" and then raised a Virginia-law claim). Judicial estoppel targets "cold manipulation" and "should not be applied if no judicial body has been led astray." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 97 (D.D.C. 2019) (citation omitted). YMTC did not lead the California court astray; as explained below, Defendants did.

*Third*, the unfairness cuts against Defendants, not YMTC. The third *Moses* factor requires that the unfairness flow from the inconsistent position itself; an "advantage" that "is not the result of a misrepresentation or inconsistent position" does not qualify. *Id.* at 97-98; *see also Moses*, 606 F.3d at 798. Defendants say that YMTC's theories have "no conceivable purpose but to attempt to avoid the preclusive effect of the California court's Order" and that Rule 4(k)(2) was "plainly to YMTC's benefit." Mot. 22. YMTC got no benefit—YMTC lost. *Id.* Ex. A at 6.

And Defendants created the situation they now decry. They wrote a forum selection clause choosing this District, argued before Judge Wise that D.C. lacked jurisdiction despite that clause—which no party put before the California court—and now seek dismissal because YMTC relied on the clause to file here. Compl. ¶¶ 25, 28-29, Ex. 5 at 6; *cf. Bautista v. Star Cruises*, 696 F. Supp. 2d 1274, 1279-80 (S.D. Fla. 2010) (imposing sanctions for failing to tell the court about forum selection clauses, calling the clause "not just a material fact but *the dispositive fact*"). YMTC is not inventing a theory to dodge preclusion. YMTC is holding Defendants to their own terms. *See Water & Sand Int'l Cap., Ltd. v. Capacitive Deionization Tech Sys.*, 563 F. Supp. 2d 278, 284 (D.D.C. 2008) (a forum selection clause "represents a promise not to invoke certain defenses when suit is filed in the contractually agreed upon venue"); *Beach TV Props.*, 254 F.

Supp. 3d at 126 (estoppel weighs against the movant where the party "does not unfairly benefit from now being able to assert" its new position after losing on the earlier one).

### III.    YMTC HAS STANDING TO BRING THIS ACTION.

#### A.    YMTC Has Properly Pleaded Article III Standing.

Defendants challenge Article III standing on two grounds: (1) YMTC has not pleaded an injury-in-fact, and (2) any alleged harm is not traceable to Defendants' conduct.  Mot. 27-30.[4] Each argument ignores the facts alleged in the Complaint and misstates the law.

Defendants claim that the Complaint does not sufficiently allege "concrete" or "particularized" injury necessary for Article III standing.  Mot. 28-29.  But it does.  Defendants conflate the standards for pleading an injury and proving one.  At the pleading stage, courts "presume that general allegations embrace those specific facts that are necessary to support the claim," and thus "general factual allegations of injury resulting from the defendant's conduct may suffice" to survive a motion to dismiss for lack of Article III standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  In evaluating Lanham Act claims, allegations of "lost sales and damage to business reputation" suffice to plead Article III standing.  *Lexmark*, 572 U.S. at 125.  A plaintiff need not state additional details, such as lost sales data; instead, it can establish an injury by "creating a chain of inferences showing how a defendant's false advertising could harm plaintiff's business."  *In re McCormick & Co. Mktg. & Sales Pracs. Litig.*, 215 F. Supp. 3d 51, 57-58 (D.D.C. 2016).

YMTC does exactly that.  YMTC alleges that CTT's false public statements caused YMTC to lose business in hand and derail negotiations for future business, which led to losses of

---

[4]  In a footnote, Defendants claim that YMTC does not allege a "competitive injury."  Mot. 28 n.5.  That is not required.  After the out-of-circuit district court case on which Defendants rely, the Supreme Court rejected a "direct competitor" requirement for Lanham Act standing. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014).

millions of dollars, damaged business relationships, and caused reputational harm.  Compl. ¶¶ 61-63.  Although not necessary, YMTC specifies a major deal that fell through because of Defendants' false statements.  *Id.* ¶ 62.  YMTC further alleges that Defendants' deception "directly influences, or is likely to influence, the purchasing decisions of [the purchasing public], causing them to refrain from purchasing products with YMTC chips and from doing business with YMTC" because of sensitivities "to national security concerns and the potential for data breaches and cyberattacks."  *Id.* ¶ 72.  These are not "conjectural" harms; they are allegations of what actually happened—a lost contract, lost revenue, and operational consequences that establish a concrete and particularized injury-in-fact.

Defendants try to break the causal chain between their conduct and YMTC's injuries by arguing that the injuries could have come from other sources of information about YMTC or from "political pressure."  Mot. 29.  But to resolve Defendants' argument, the Court would have to look beyond the pleadings and weigh evidence (not yet in the record) that, at best for Defendants, will be disputed.  At the pleading stage, YMTC is not required to allege—much less, ***prove***—that Defendants' campaign was the ***sole*** cause of YMTC's injury.

Instead, the narrow inquiry at this stage is whether YMTC alleges that Plaintiffs' injury is "fairly traceable" to the defendant's conduct.  As discussed above, that can be established by alleging a "chain of inferences" showing how a defendant's false advertising could harm the plaintiff's business.  *In re McCormick*, 215 F. Supp. 3d at 57-58.  "All claims of competitive injury are to some extent speculative, since they are predicated on the independent decisions of third parties; *i.e.*, customers."  *Id.* at 57.  Article III standing "does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries.  Instead, an injury may be 'fairly traceable' to a defendant, where the defendant's conduct was a 'substantial

27

factor' leading to the injury itself." *Lee v. SEED Pub. Charter Sch.*, 2020 WL 4923619, at \*4 (D.D.C. Aug. 1, 2020) (citation omitted).

The Complaint more than sufficiently pleads such a causal link, satisfying both the threshold for Article III standing and the more stringent proximate cause required for Lanham Act standing (discussed below in Section III.B). The injury alleged—lost sales and reputational harm—is traceable to Defendants because:

- Micron paid Defendants to execute the smear campaign against YMTC. Compl. ¶ 9.

- Defendants published false reports targeting YMTC's commercial customers and urging them to cease doing business with YMTC. *Id.* ¶¶ 11-12.

- As a direct and foreseeable result of this targeted commercial pressure, YMTC's deal with original equipment manufacturer ("OEM") Customer #1 collapsed. *Id.* ¶ 62.

- The same reports also fueled a broad public campaign against YMTC, causing ongoing commercial harm. *Id.* ¶¶ 39, 41, 63.

- Defendants acted as Micron's paid agent and instrumentality, which Defendants do not deny,[5] expressly to inflict that injury. *Id.* ¶¶ 9, 22-23, 39.

Plaintiffs have thus alleged that Defendants published the false statements on behalf of their client, Micron, a direct YMTC competitor. *See* Compl. ¶ 17 ("scheme that Defendants, DCI, and Micron orchestrated") & Exs. 1-2 (Micron funds CTT), ¶ 39 & Ex. 1 (independent reporting that CTT was an "astroturfing" operation), ¶ 49 (Defendants' scheme to create a website "surreptitiously" backed by a YMTC competitor is an established DCI tactic).

Defendants assert that YMTC does not explain how Defendants' conduct was a substantial factor in the harm or "otherwise connect the dots with factual allegations." Mot. 28-

---

[5] Remarkably, Defendants admit that they "started the CTT website" and published the pieces that YMTC alleges contained objectively false and misleading information. Mot. 7.

28

29.  But the Complaint plainly connects the dots, including in the sentences immediately preceding the quote on which Defendants rely.[6]

Defendants' related argument—that the Complaint is too vague in alleging generalized harm to "a broad range of potential and largely undefined customers," Mot. 29—is also contrary to law.  *See KLEO AG v. Rivada Networks, Inc.*, 148 F.4th 741, 750 (D.C. Cir. 2025) (information such as the specific dates a plaintiff lost business is an unnecessary "degree of detail" at the motion to dismiss stage, and the inability to precisely discern the "alleged lag time" between the harmful conduct and the loss of business is not fatal to a claim).  YMTC alleges a specific example of lost business and has created a plausible basis for the loss of other business and reputational harm.

Finally, Defendants attempt to place the blame for YMTC's lost business on the federal government or its officials.  Mot. 29.  That is not justified.  The harm is no less traceable to Defendants simply because government officials also published statements opposing YMTC.  As YMTC alleges, YMTC lost its contract with OEM Customer #1 *after* Defendants intensified their disinformation campaign in mid-2022 and *before* two of the three statements Defendants cite as exhibits.  Compl. ¶¶ 12, 62; Mot. Ex. D at 2 (Dec. 2022), Ex. E at 1 (Jan. 2024).

The statements from the third source, a White House report, discuss the risk of "malicious supply chain disruptions" and the subsidies YMTC received from the Chinese government.  Mot. Ex. C at 55.  But the section with Defendants' cherry-picked quote discusses

---

[6]  Compl. ¶ 71 ("Defendants' statements deceived, or had the tendency to deceive, a substantial segment of the relevant purchasing public … including YMTC's customers and prospective customers … who rely on or likely will rely on accurate information about technology products when making purchasing decisions … their statements were false or misleading and intended to deceive these audiences into believing that YMTC and its products posed a security risk, were inferior in quality to Micron's products, or were otherwise undesirable"), *id.* ¶ 72 ("Defendants' deceptive statements were material and likely to influence purchasing decisions").

only generic, theoretical risks to the entire semiconductor industry, without any specific connection to YMTC's products or the OEM Customer #1 transaction. *Id.* Although many Asian manufacturers produce memory products, the White House report does not mention YMTC in discussing any risks, and mentions the subsidies the company received only in the context of its rapid expansion. *Id.* at 29, 55. This contrasts with Defendants' statements that made specific, technologically-impossible claims about YMTC.

This matters for causation. A sophisticated OEM would distinguish between: (1) a general report discussing theoretical supply chain vulnerabilities in the semiconductor industry, and (2) specific claims that target YMTC's products as posing espionage risks. YMTC alleges that CTT publications' precise accusations about YMTC—not generic, industry-wide warnings—caused purchasers of memory products to view YMTC as a threat and to conclude that sourcing from YMTC posed unacceptable risks. Compl. ¶¶ 60-63.

Regardless, Defendants' argument cannot be resolved at the pleading stage. YMTC has sufficiently pleaded that Defendants and CTT's statements were at least a substantial factor or proximate cause of the injury to its business and reputation. *See Lexmark*, 572 U.S. at 138 ("a defendant who seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product may be said to have proximately caused the plaintiff's harm") (internal quotations omitted).

### B.      The Complaint Sufficiently Pleads Lanham Act Standing.

To establish Lanham Act standing, often referred to as "statutory standing," a plaintiff's injuries must: (1) fall within the statute's "zone of interests," and (2) be "proximately caused" by the defendant's conduct. *Lexmark*, 572 U.S. at 128 n.4, 129. Defendants do not argue that YMTC fails to meet the first factor, and YMTC meets the second.

The second factor requires "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*, 572 U.S. at 133. A defendant who promotes its interest by telling a known falsehood about a plaintiff or his product "may be said to have proximately caused the plaintiff's harm." *Id.* at 138.

Plaintiffs have met this pleading standard. Defendants aimed their deception—falsely framing YMTC's memory chips as tools of espionage and linked to criminal enterprises—at YMTC's existing and potential customers. YMTC alleges how the intended and actual result of the CTT publications, namely "*Silicon Sellout*," was that customers would "withhold trade" from YMTC by imploring it to "source its chips from existing suppliers like Micron," and "source memory chips from non-Chinese chipmakers like Micron." Compl. ¶¶ 12, 52-58, Ex. 4 at 4, 8, 14. The proximate causation is direct: Defendants published the false statements targeting specific YMTC customers, and shortly thereafter YMTC suffered damage to its business and reputation, including the termination of a lucrative deal. *Id*. ¶¶ 61-63.

Instead of arguing that no ***proximate*** link exists between their actions and the resulting harm to YMTC, Defendants argue that no ***direct*** connection to them exists because YMTC did not allege: (1) that CTT or Defendants were a source regularly relied on by its customers, or (2) the injuries resulted in a "benefit to Defendants," *i.e.*, that Defendants received the money that YMTC lost. Mot. 30-33. These issues have no bearing on whether the Complaint adequately pleads proximate cause.

***First***, Defendants assert that "more prominent sources that were unrelated to Defendants or the China Tech Threat website" discussed the risks associated with YMTC's relationship with the Chinese government. Mot. 31-32. That is not the correct standard. "To find proximate

31

cause, defendants' conduct need not be the sole cause of the harm, but rather a substantial factor in bringing about the harm. This is true even if there may be other legal or proximate causes of the injury." *Democracy Partners, LLC v. Project Veritas Action Fund*, 2025 WL 1088090, at *10 (D.D.C. Apr. 11, 2025) (analyzing proximate cause for a fraudulent misrepresentation claim) (citation omitted). At this stage, Defendants cannot establish as a matter of law that they could not have played ***any*** role in damaging YMTC's business or reputation, and that some other factor must have been the cause. That would require the Court to go well beyond the pleadings and weigh evidence that is not yet even in the "record."

Defendants' reliance on *Geomatrix, LLC v. NSF Int'l*, 629 F. Supp. 3d 691 (E.D. Mich. 2022) (Mot. 31-32), is equally flawed. There, the plaintiff claimed to have been injured because it could not obtain product approval from state environmental regulators. *Id.* at 699. The court found proximate cause lacking because the actual cause of the plaintiff's inability to sell its products was the "independent decision of each state's environmental regulators," decision-making processes which the court described as driven by a "unique combination of internal and external variables" that made it "impossible to trace a straight line" from the defendant's conduct to each and every state's regulatory decisions through an "extenuated causal chain." *Id.* at 709-10. The plaintiff did not dispute that the "actual cause" of its harm was its inability to sell products in states where the regulators had not approved their sale. *Id.*

Unlike *Geomatrix*'s attenuated casual chain, the causal chain here is direct. Defendants' campaign, which made specific factual claims about the security risks of YMTC's chips, was intended to influence the commercial decisions of a specific company and industrial sector. The collapse of the deal with OEM Customer #1 was not the result of disparate regulatory processes denying YMTC the ability to sell its products, but a direct and foreseeable result of Defendants'

false statements intended to deceive YMTC's customers. Such deception of a commercial customer *is* the mechanism of harm, not a superseding cause that breaks the chain of causation.

On that point, YMTC alleges that Defendants' disinformation campaign began in September 2020 (Compl. ¶ 11), with exhibits dated January 4, 2021 (Ex. 3), July 13, 2021 (Ex. 6), November 2021 (Ex. 7), and June 2022 (Ex. 4). By comparison, only one of Defendants' exhibits falls within this timeframe. *See* Mot. Ex. C (dated June 2021). The rest came after the collapse of YMTC's deal with OEM Customer #1 and the accompanying harms. *Id.* Ex. D at 2 (Dec. 19, 2022), Ex. E at 1 (Jan. 31, 2024). Thus, two thirds of the publications on which Defendants rely for their ***intervening*** cause argument are irrelevant because they came ***after*** CTT had already published its pieces disparaging YMTC and encouraging business with Micron (Compl. Ex. 4 at 14, Ex. 3 at 2); and ***after*** the collapse of YMTC's deal with OEM Customer #1 and the accompanying harms. As a result, it is a more than plausible inference that CTT's statements, as published by Defendants, sufficiently swayed YMTC's potential customers independent of the involvement of any other entity.

***Second***, Defendants assert that Lanham Act standing fails because YMTC does not specifically allege that customers knew of the CTT publications, or regularly relied on statements from sources like CTT in making purchasing decisions. Mot. 32. Defendants seek to impose a heightened evidentiary standard of "proof of receipt" at the pleading stage, which has no basis in law. At this stage, the Court must draw all reasonable inferences in YMTC's favor. It strains credulity for Defendants to argue that they were bad at the very job for which Micron hired them and the articles they wrote for the sole purpose of smearing YMTC to its existing and potential customers would not have reached the intended audience in the industry—*e.g.*, that Apple would

33

not have seen a widely disseminated disinformation campaign that **specifically named Apple** (Compl. ¶ 12) and urged it to drop YMTC.

Defendants again rely on out-of-circuit district court cases for this proposition, and each is factually distinct from the allegations here.  In *Maffick LLC v. Facebook, Inc.*, 2021 WL 1893074 (N.D. Cal. May 11, 2021) (Mot. 32-33), the plaintiff was merely a Facebook account posting content with "no obvious connection between this content and the sale of goods or services" and could not identify what line of business it was actually in, and failed to identify any commercial injury beyond vague claims about social media engagement nor who its customers "might be." *Id.* at *3-5.  Likewise in *Univ. Loft Co. v. Avteq, Inc.*, 2015 WL 13548950 (S.D. Tex. Dec. 22, 2015) (Mot. 32-33) the plaintiff, a furniture company, sued a competitor for falsely advertising that it held certain government contracting certifications (*e.g.*, "woman-owned").  *Id.* at *10.  The court found that plaintiff's hypothetical link was too attenuated to plausibly connect the false statement to a lost contract where it alleged only that a government procurement officer *might* give "additional consideration" to a vendor with such a certification in an unrestricted bidding process.  *Id.* at *9.  In *Barrett v. Atlantic Monthly Grp.*, 2024 WL 4119400 (D.D.C. Sept. 9, 2024) (Mot. 33), the court dismissed a **breach of contract** claim—not a Lanham Act claim— where the plaintiff alleged only "generalized harm" that it was "more difficult … to practice her profession," without identifying a single lost opportunity.  *Id.* at *19.

Unlike the speculative and disconnected claims in the above cases, YMTC alleges a direct line from a targeted campaign with false statements about core product security that targeted specific commercial customers to cease business with YMTC, followed by the collapse of a specific customer contract.  Compl. ¶¶ 12, 52, 62.  YMTC alleges that Defendants, DCI, and Micron had a financial arrangement, and that DCI has been reported to "disguis[e] corporate

34

messaging as grassroots advocacy" (*id.* ¶ 17), even going as far as to operate websites to "promote its corporate clients' goods, services, and commercial activities" (*id.* ¶ 49). Corroborating this, independent reporting found that "DCI Group employees were included in the metadata of documents embedded on the [CTT] website." *Id.* Ex.2.

## IV.    YMTC HAS STATED A PLAUSIBLE LANHAM ACT CLAIM.

To prevail, Plaintiffs must allege that: (1) Defendants made a false or misleading statement of fact in a commercial advertisement; (2) the statement actually or likely deceived its audience; (3) the deception is material in its effect on buying decisions; (4) Defendants caused the false statement to enter interstate commerce; and (5) Plaintiffs have been or are likely to be injured as a result. *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 6 (D.D.C. 2010).  Defendants take issue with only the first element.  They argue that the CTT publications are not "commercial speech" and none of the statements made in the CTT publications are "false or misleading."  Mot. 34.  For the reasons below, Defendants are wrong.

### A.    Defendants Engaged in Commercial Speech.

"Commercial speech is defined as 'expression related solely to the economic interests of the speaker and its audience' or 'speech proposing a particular transaction.'" *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561-62 (1980)).  "In addition to information related to proposing a particular transaction, such as price, it can include material representations about the efficacy, safety, and quality of the advertiser's product, and other information asserted for the purpose of persuading the public to purchase the product." *Id.*

Defendants argue that the Complaint fails to allege commercial speech because the CTT publications address "political and public policy issues directed to a political audience."  Mot. 35-37, 40.  Defendants' attempt to shield their publications as protected "political speech" is

35

flawed.  Defendants wrongly suggest that including political commentary immunizes from liability what is otherwise commercial speech.  The law does not permit a speaker to shield false advertising from scrutiny simply by interweaving it with a discussion of public policy issues. The Court's analysis must consider the speech as a whole and where, as alleged here, the publication is part of an "astroturfing" scheme designed to inflict commercial harm (which Defendants do not deny), the Court must examine the commercial purpose and nature of the speech, not just any political repackaging.

The CTT Report is quintessential commercial speech because it "propos[es] a particular transaction."  *Philip Morris*, 566 F.3d at 1143 (quoting *Cent. Hudson*, 447 U.S. at 561-62).  The Report does not discuss policy only.  It makes an explicit and repeated commercial pitch for Micron, which funded DCI and CTT.  Notably, the court in *Municipal Revenue Serv. v. Xspand, Inc.*, 700 F. Supp. 2d 692 (M.D. Pa. 2010), held that where a defendant's conduct in making false statements was "primarily tailored to disrupt plaintiff's business rather than directly designed to garner favorable government action for itself," the false statements were in service of commercial rather than policy objectives.  *Id.* at 700-01.  This is precisely the objective behind the CTT Report, further evidencing its commercial nature in proposing transactions with Micron. It implores a specific company, Apple, to "voluntarily end its partnership with YMTC" and instead "source its chips from existing suppliers like Micron."  Compl. ¶ 12, Ex. 4 at 4.  This is not subtle political commentary.  It is a direct call for a specific customer to terminate a contract with a competitor and enter into a transaction with Micron.

The speech must also be evaluated within the context of the alleged scheme.  YMTC alleges that the CTT enterprise is a commercial façade—a "front" for the sole purpose of advancing the economic interests of its paying sponsor, Micron.  Compl. ¶¶ 9, 16, 47, 49, 56-57

("The CTT Report and other publications and statements were not good-faith contributions to public policy … The commercial statements themselves were covert commercial advertisements designed to promote Micron at YMTC's expense").  As the Ninth Circuit held in a similar "stealth marketing" case, YMTC has "alleged enough to make it plausible that [Defendants] published the [CTT Report] mainly to reap the financial benefits of a hidden marketing arrangement with [Micron] rather than to inform consumers."  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117, 1119 (9th Cir. 2021) ("Simply put, paid promotion is commercial speech"). In that case, a nutritional supplement company successfully challenged what purported to be an independent product review that had secretly rigged its ratings to favor a competing manufacturer in exchange for compensation.  *Id.* at 1114, 1119.  The Ninth Circuit held that such "stealth operations intended to disparage a competitor's product while posing as a neutral third party" constitute commercial speech.  *Id.* at 1119.  The court reasoned that "liability can arise under the Lanham Act if websites purporting to offer reviews are in reality" hidden marketing arrangements designed to disparage a competitor for the defendant's financial gain.  *Id.*

Here, YMTC alleges an identical scheme.  Micron funded DCI and CTT to create what would appear to be independent policy analysis but was actually a hidden marketing arrangement designed to disparage YMTC for Micron's financial gain.  Compl. ¶¶ 11, 15-16, 45, 56-59.  DCI then called on U.S. companies to end their business with YMTC and buy chips from other suppliers, including Micron, based on false security threats in YMTC's chips.  *Id.* ¶¶ 12, 42, 52.

The *Bolger* factors further confirm that this speech is commercial.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983) (listing non-exclusive "commercial speech" factors, including whether: (1) the speech is an advertisement, (2) the speech refers to a particular product, and (3) the speaker has an economic motivation).  Indeed, even speech that

37

does not propose a commercial transaction on its face can still be commercial speech. *Id.* at 66-68 (pamphlets that discussed a matter of public concern, but that mentioned the name of a product and were motivated by profit, were commercial speech).[7]  YMTC alleges that the CTT Report has the hallmarks of commercial speech: It references a specific product (YMTC's memory products), promotes Micron as the preferred alternative, and was created for an economic motive, as Micron paid DCI and Defendants to disseminate the content.  Compl. ¶¶ 4, 39.

Defendants' reliance on cases involving genuine non-commercial speech (Mot. 34-35, 40-41) is unjustified, and the distinctions are dispositive.  In *Farah v. Esquire Magazine, Inc.*, 736 F.3d 528 (D.C. Cir. 2013), the D.C. Circuit found no commercial speech because the parties were not direct competitors in a product market but competed only "in the marketplace of ideas." *Id.* at 541.  Here, Micron and YMTC are among the few rivals in the market for an essential technology component, where, as YMTC alleges, "a failed deal for YMTC materially increased Micron's likelihood of securing those deals."  Compl. ¶ 16.  In *Neurotron, Inc. v. American Association of Electrodiagnostic Medicine*, 189 F. Supp. 2d 271 (D. Md. 2001), the court held on summary judgment that an article in an academic journal was not commercial speech because "nowhere in the article do the authors advocate for a commercial transaction … neither … that the reader buy any product or service, nor that they refrain from buying any product or service." *Id.* at 276.  Similarly, in *Peak Health Ctr. v. Dorfman*, 2019 WL 5893188, *7 (N.D. Cal. Nov. 12, 2019), the publication "contain[ed] nothing that can plausibly be characterized as advertising or promoting [a competitor's] own products (or anyone else's)."  Here, the CTT Report does

---

[7]  The *Bolger* framework provides a court with an alternative analytical tool that applies when expression "does not fit within the traditional definition [of] commercial speech." *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2016 WL 5118530, at *6 (S.D. Cal. Sept. 21, 2016).

what the *Neurotron* and *Peak Health* articles did not: It implores Apple on behalf of profit-driven companies Micron, DCI, and Strand to stop buying from YMTC and buy from Micron.

Defendants further argue that one or two sentences that may qualify as "commercial" in a publication do not automatically convert otherwise non-commercial speech to commercial speech. Mot. 38-39. But unlike Defendants' cases discussing speech that was primarily educational, or commercial and non-commercial speech that was "inextricably intertwined" due to a required disclosure, *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795-96 (1988); *Neurotron*, 189 F. Supp. 2d at 276, YMTC alleges that the CTT Report's primary purpose was commercial. Compl. ¶ 13 ("the CTT Report's true purpose is to advance Micron's agenda"). Defendants also assert that the challenged statements are "incidental to the primary purpose of the overall publication." Mot. 39. The statements were far from incidental to the CTT Report's primary purpose. Indeed, the CTT Report names YMTC in its title, "*Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker **YMTC** Threatens American National Security*," and mentions YMTC 145 times in 16 pages (an average of 9 times a page). Compl. Ex. 4 (emphasis added). There is no reasonable debate that the primary purpose of the report was to target YMTC. In contrast, Defendants cite cases where a product was referenced "only three times in 500 pages" or where there were "two lines of commercial text in a 270-page book." Mot. 39.

Defendants argue that their statements are not commercial speech because Defendants are not in "commercial competition" with YMTC. Mot. 39-40. However, as noted above, Defendants do not have to be in competition with YMTC for their statements to constitute commercial speech. *See Lexmark*, 572 U.S. at 136 ("It is thus a mistake to infer that because the

39

Lanham Act treats false advertising as a form of unfair competition, it can protect *only* the false-advertiser's direct competitors").

Defendants cite other cases holding that vague allegations of a defendant's financial incentives, standing alone, are insufficient to show commercial speech, such as where: (1) non-profit organizations "stood to benefit" or "intended to benefit" from publishing articles; (2) defendant's database was tailored "in the hope" that payors would continue to license it; (3) plaintiffs failed to allege that publications influenced consumers to buy (as opposed to just "increasing the value of") defendants' artworks; (4) plaintiff only alleged that defendant "had an interest in encouraging others to purchase" its database; (5) defendant received "some profit" as a scientific skeptic; and (6) defendant had a "simple profit motive" to sell copies of a publication. Mot. 41-42. Defendants also note that the CTT website is free and has no ads. Mot. 42.

However, YMTC's allegations regarding the CTT Report are quintessential commercial speech and do not make just vague allegations that Defendants stood to gain some benefit. The statements proposed a particular transaction and made an explicit commercial pitch for Micron. Compl. ¶ 12 (imploring Apple to "voluntarily end its partnership with YMTC" and instead "source its chips from existing suppliers like Micron"). Moreover, rather than the CTT website providing Defendants with just some incidental benefit, YMTC alleges that the entire CTT enterprise is a "front" created and operated by Defendants and DCI for the sole purpose of advancing the economic interests of its paying sponsor, Micron. *Id*. ¶ 49.

## B. The Statements Were False or Misleading.

A Lanham Act plaintiff must plead that a false or misleading representation of fact was "literally false or misleading to the public or verifiably false or misleading." *Aristotle Int'l*, 714 F. Supp. 2d at 6. To satisfy this element, YMTC must allege that Defendants' advertising was either: (a) literally or verifiably false, or (b) "at least likely to mislead or confuse consumers."

40

*Id.*  YMTC alleges Lanham Act liability for four statements that CTT published in *Silicon Sellout* and one it published in a 2021 article.  Compl. ¶ 68.  Defendants dispute the false or misleading nature of the statements.  Mot. 43-44.  But YMTC's Complaint sufficiently pleads falsity.

YMTC alleges that Defendants' statements were literally or verifiably false.  The CTT Report states that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing" and "exfiltrate data," compromising "iPhone users' security and privacy."  Compl. ¶¶ 14, 44, Ex. 4.  Those statements are literally or verifiably false because "memory chips, including YMTC's, lack the components for wireless transmission or remote control" and "cannot execute code;" rather, they simply store bits of data (0s and 1s).  *Id.* ¶¶ 14, 53.  YMTC's chips cannot "funnel" or "exfiltrate" data to China, as the CTT Report falsely states, and such statements are "made … up" "fiction."  *Id.* ¶ 14.

The CTT Report further states that YMTC's chips: (1) have "built-in and concealed vulnerabilities" that could be "exploited months or years later to disrupt performance"; (2) present the chance that "malicious technology … from the Chinese military could be introduced to Apple end-users"; and (3) have a "kill switch" that "could be enabled or programmed to shut down remotely by an unauthorized Chinese government actor."  *Id.* ¶¶ 52, 68.  Those statements are also literally or verifiably false because, as noted above, YMTC's chips lack "components for wireless transmission or remote control" and "cannot execute code."  *Id.* ¶ 53.  YMTC's chips therefore cannot: (1) have "concealed vulnerabilities" that can later be "exploited"; (2) allow for the introduction or installation of "malicious technology" to the end-user device; nor (3) turn on or enable a "kill switch."

Defendants' only response to YMTC's allegations of falsity is that the statements offer "hypothetical and/or forward-looking statements" that "would reasonably be interpreted by a

consumer of YMTC's products to be objective facts."  Mot. 43-44.  The statements themselves contradict that argument.  For example, one begins with "YMTC chips equipped with spyware."  Compl. ¶¶ 14, 52, 68(b).  In other words, "YMTC chips [are] equipped with spyware."  That statement identifies a ***present*** issue with YMTC's chips.

Defendants make the same "prediction" argument (Mot. 43-44) for three other statements.  But those statements also presuppose that YMTC's chips already have malicious technology.  For example, one statement says that "these built-in and concealed vulnerabilities … could be exploited."  Compl. ¶¶ 52, 68(d).  Again, that presumes that YMTC's chips ***already*** have spyware through "built-in and concealed vulnerabilities."  Another statement says that "electronics with embedded chips ***are*** enabled with a 'kill switch.'"  *Id.* ¶ 68(e) (emphasis added).  The verb "are" is in the present tense.  And the statement that YMTC's chips could allow installation of "malicious technology … from the Chinese military" onto cell phones assumes that YMTC's chips are setup at production for such nefarious activities.  *Id.* ¶ 68(c).

Moreover, despite the use of "could," the statements make present-tense factual assertions about the technical capabilities of YMTC's memory chips.  For example, saying "this car could fly to the top of a building" falsely implies that cars have flight capability.  The conditional framing does not immunize objectively false technical assertions about product capabilities.  YMTC's memory chips cannot perform the espionage functions CTT attributed to them.  They lack basic components like antennas, modems, and processors necessary for data transmission.  Compl. ¶ 53.  These are not matters of opinion or prediction but objective technical impossibilities that Defendants knowingly misrepresented to harm YMTC's commercial relationships.  Indeed, each of Defendants' statements is "capable of being prove[n]

42

false or of being reasonably interpreted as a statement of objective fact," and thus actionable under the Lanham Act. *Ariix*, 985 F.3d 1107, 1121-22.

The statements also damaged YMTC in a way that Defendants' sample prediction statements could not. By saying that YMTC's chips "could" send a cell phone user's sensitive personal data to China, the damage to YMTC's core product and reputation was done. But even if the statements were not literally or verifiably false (they were), the statements were "at least likely to mislead or confuse consumers," and therefore meet this requirement in the alternative. *Aristotle Int'l*, 714 F. Supp. 2d at 6. In any event, when the time comes to address this issue, the evidence will establish that the statements are not matters of opinion but are objectively false. *Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 34 (1st Cir. 2000) ("Whether an advertisement is literally false is typically an issue of fact").

Defendants argue that the fifth challenged statement ("YMTC is associated with criminal activity") is non-actionable. Mot. 44. Defendants argue that "associated with" does not necessarily mean that YMTC "is directly engaged in criminal activities or is a criminal." *Id.* Whether the statement is directly accusing YMTC of engaging in criminal activity or associating YMTC with such activity is a distinction without a difference. The harm to YMTC was done, particularly given the laundry list of criminal activities provided ("Social Security spoofing scam, identity theft, and cyber extortion"). Compl. ¶¶ 11, 51, 68(a).

Defendants further argue that a reader of the five challenged statements would think they were only the "opinions of the authors." Mot. 44-45. But that is always the case with an advertisement. And Defendants misinterpret Lanham Act law by citing to a section of *Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265 (E.D.N.Y. Oct. 25, 2019) addressing *defamation* based on a single headline. *Id.* at *8 ("Having concluded that the phrase … is an opinion, the

Court must determine whether it is … a mixed opinion that may be a basis of a defamation claim"). In contrast, the Lanham Act analysis from that case addresses whether an entire blog post was commercial advertising or promotion, and does not concern itself with the "opinion" nature of the post, *id.* at *9-10, in line with YMTC's analysis elsewhere in this opposition.

## V.    IF NECESSARY, THE COURT SHOULD GRANT LEAVE TO AMEND.

YMTC's claims should survive because they state a valid Lanham Act claim based on commercial speech that was false or misleading. Should the Court find any deficiency in the Complaint, YMTC respectfully requests leave to amend. "The court should freely give leave when justice so requires," and that standard "severely restricts the court's discretion to deny leave to amend and dismiss." *Bronner v. Duggan*, 324 F.R.D. 285, 290 (D.D.C. 2018). Dismissal without leave is improper unless amendment would be futile. *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). YMTC maintains that the Complaint is sufficient but stands ready to amend if the Court directs.

## CONCLUSION

For the reasons above, the Court should deny Defendants' Motion to Dismiss.

Dated: March 16, 2026                                 Respectfully submitted,

                                                      QUINN EMANUEL URQUHART
                                                         & SULLIVAN, LLP

                                                      By _____
                                                         Robert M. Schwartz
                                                         *Attorneys for Plaintiffs*

44